1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
9                                       AT TACOMA

10

11      CHRIS ADAMSON, et al.,                    CASE NO. 3:21-cv-05592-DGE

                                  Plaintiffs,     ORDER GRANTING IN PART
12                                                AND DENYING IN PART
              v.                                  DEFENDANTS' MOTION TO
13                                                DISMISS
        PIERCE COUNTY, et al.,
14
                                  Defendants.
15

16                              I.      INTRODUCTION

17            This matter comes before the Court on Defendants Pierce County, James Schacht, Fred

18      Wist, Paul Pastor, and Brent Bomkamp's (collectively, "Defendants") Motion to Dismiss based

19      on immunity.  (Dkt. No. 4.)  Plaintiffs opposed Defendants' motion.  (Dkt. No. 8.)  For the

20      reasons stated herein, the Court GRANTS in part and DENIES in part Defendants' Motion to

21      Dismiss.[1]

22
        _____
23      [1] In their response to Defendants' Motion to Dismiss, Plaintiffs requested oral argument.  (Dkt.
        No. 8 at 1.)  However, the Court determines that oral argument would not be helpful to the
24      Court's disposition of this motion and denies Plaintiffs' request.  *See* LCR 7(b)(4).

## II.    BACKGROUND

Plaintiffs, nine Pierce County Sheriff's Department law enforcement officers, were assigned to the Department's Special Investigation Unit (SIU)—a unit dedicated to investigating narcotics and enforcing anti-vice laws in Pierce County.  (Dkt. No. 1-2 at 5-10.)  Defendants are Deputy Prosecuting Attorneys James Schacht and Fred Wist, former Sheriff Paul Pastor, Undersheriff and Acting Sheriff Brent Bomkamp, and Pierce County, as a governmental entity operating through its officials and employees.  (*Id.* at 6.)

In their Complaint, Plaintiffs allege that "[i]n their official capacity, Pierce County's officials fabricated allegations [against Plaintiffs] then recorded them in documents to publish as so called 'Brady' material."  (*Id.* at 5.)  The term "Brady" refers to the case *Brady v. Maryland*, in which the United States Supreme Court held that prosecutors have a duty to disclose potentially exculpatory evidence to criminal defendants.  373 U.S. 83 (1963).  Prosecutors must also disclose evidence that may impeach a witness' credibility, referred to as potential impeachment evidence ("PIE").  *See Giglio v. United States*, 405 U.S. 150, 154–55 (1972). Prosecutors have a duty to disclose *Brady* material known to law enforcement, even if the prosecutor is unaware of the information.  *Browning v. Baker,* 875 F.3d 444, 460 (9th Cir. 2017) ("*Brady* imposes a duty on prosecutors to learn of material exculpatory and impeachment evidence in the possession of state agents, such as police officers").  Accordingly, the Pierce County Prosecuting Attorney's Office (PCPAO) has various policies intended to maintain *Brady* compliance, including PCPAO's Policy Regarding Disclosure of PIE for Recurring Government Witnesses.  (*See* Dkt. No. 1-2 at 70, 76, 80.)

The facts, as alleged by Plaintiff, are recounted by the Court below.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

In March 2020, PCPAO initiated an investigation of SIU, in which "Schacht conducted investigative interviews of [P]laintiffs." (*Id.* at 24*.*)  One of Plaintiffs' fellow SIU officers complained that SIU conducted a "ruse designed to protect a source" and relayed "ludicrous and speculative rumors" that Plaintiffs planted and misappropriated drugs.  (*Id.* at 23.)  Schacht then "required" the Sheriff's Department to obtain Plaintiffs' work phones so that he could search their texts.  (*Id.*)  Misinterpreting Plaintiffs' texts, Schacht believed Plaintiffs had planted drugs on a suspect (referred to by Plaintiffs as "Suspect 2").  (*Id.* at 24.)  Around March 25, 2020, Schacht released Suspect 2 to the FBI so that it could investigate Plaintiffs' supposed misconduct.  (*Id.*)  However, the FBI found Plaintiffs had not in fact planted drugs on Suspect 2. (*Id.* at 25.)

On April 6, 2020, Schacht sent a letter to Bomkamp, in which he "memorializ[ed] . . . seven cases that in his opinion contained potential impeachment evidence," and "directed PCSD to provide internal investigative findings as to each case listed."  (Dkt. No. 1-2 at 25.) Bomkamp responded and confirmed that three of the cases had not been internally investigated. (*Id.*)  Subsequent investigations by Kitsap County and Internal Affairs were opened into the matters listed on Schacht's April 6, 2020 letter.  (*Id.* at 38.)  These investigations "were intended to generate [*Brady*] or 'PIE' materials to discredit [P]laintiffs because [P]laintiffs had engaged in protected activities."  (*Id.*)

One of the cases listed in Schacht's April 6, 2020 letter, the Wales case, involved a "no charges filed decision" written by Wist, which was "replete with false accusations and erroneous conclusions."  (*Id.* at 29.)  In the decision, Wist included incorrect facts and was unfairly critical of Plaintiff Darby and his supervising officer, Plaintiff Lieutenant Fajardo.  (*Id.* at 30.)

1    In the months following Schacht's original inquiry, the Sheriff's Department "shut down"

2   SIU on two occasions, corresponding with news articles published in The News Tribune (TNT).

3   Specifically, on April 21, 2020, Pastor removed Plaintiffs from their SIU assignments.  (Dkt. No.

4   1-2 at 41.)  A few days after this SIU "shut down," Pastor was quoted by TNT stating, "[o]ur

5   own deputies brought their concerns to our attention because they want to do things right" and

6   "[w]e intend to do things according to correct procedures in order to hold officers accountable

7   and maintain the public's trust."  (Id.)

8    On June 22, 2020, Schacht notified Plaintiffs that they were officially placed on the

9   Brady list.  (Id. at 39.)  Pastor reassigned Plaintiffs Adamson, Bray, Cole, Maas, and Reigle to

10   SIU on July 13, 2020, while the remaining Plaintiffs were not returned to their SIU assignments.

11   (See id. at 6-10.)

12    On July 15, 2020, TNT published an article titled "Failure to follow protocol: Sheriff's

13   drug unit investigated for alleged false reports."  (Id. at 42.)  The Sheriff's Department told TNT

14   that "five of the [P]laintiffs were under investigation" and released the names of Plaintiffs "in

15   conjunction with specific allegations of wrongdoing that were false."  (Id.)  In the same article,

16   Plaintiffs provided the following quote.

17
     The SIU team members attribute the prosecutor office's actions to a clash over their
18   respective duties as it pertains to undercover operations that involve confidential
     informants and other clandestine operations.  Prosecutors have a duty to disclose
19   confidential informant information and that duty directly conflicts with SIU
     investigators' duties to maintain informant confidences to develop leads and disrupt
20   drug trafficking in Pierce County.

21   (Id. at 43.)  Plaintiffs further stated, "[w]ithout that standing working relationship [between SIU

22   and PCPAO], the communication broke down and compromised trust between the departments."

23   (Id.)

24

1    In response, Pierce County Prosecuting Attorney Mary Robnett sent an email to

2    Bomkamp, in which she stated "[w]hile we were aware that this article was coming, seeing today

3    the actual words and arguments used by these deputies through their attorney makes clear that

4    my office must decline working with SIU personnel who are on our [*Brady*] list for the time

5    being." (Dkt. No. 1-2 at 43.)  On July 20, 2020, Bomkamp "shut down SIU operations a second

6    time." (*Id.* at 44.)  Plaintiffs Adamson, Bray, Cole, Maas, and Reigle were again removed from

7    their SIU assignments.  (*Id.* at 6-9.)  Plaintiffs allege that Defendants took these adverse

8    employment actions, at least in part, in retaliation for Plaintiffs vocally supporting Lieutenant

9    Fajardo in her bid to become Pierce County Sheriff.  (*Id.* at 38-39.)

10    On October 2, 2020, Plaintiffs Maas and Cole were removed from the *Brady* list,

11    followed by Rayner, removed on November 6, 2020.  (*Id.* at 39.)  All other Plaintiffs remain on

12    the *Brady* list and PCPAO has no written policy for removal.  (*Id.* at 39-40.)

## III.    DISCUSSION

### A.  Legal Standard for Motions to Dismiss

15    Federal Rule of Civil Procedure 12(b) motions to dismiss may be based on either the lack

16    of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

17    theory.  *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  Material

18    allegations are taken as admitted and the complaint is construed in the plaintiff's favor.  *Keniston*

19    *v. Roberts*, 717 F.2d 1295 (9th Cir. 1983).  "While a complaint attacked by a Rule 12(b)(6)

20    motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the

21    grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

22    recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550

23    U.S. 544, 554-55 (2007) (internal citations omitted).  "Factual allegations must be enough to

1    raise a right to relief above the speculative level, on the assumption that all the allegations in the

2    complaint are true (even if doubtful in fact)." *Id*. at 555.  The complaint must allege "enough

3    facts to state a claim to relief that is plausible on its face." *Id*. at 547.

4    **B. Prosecutorial Immunity**

5         Plaintiffs sue Schacht and Wist under 42 U.S.C. § 1983 in their individual capacity for

6    damages and official capacity for purposes of injunctive relief.  (Dkt. No. 1-2 at 50.)  Plaintiffs

7    allege that Schacht and Wist abused their authority as prosecutors to violate Plaintiffs' First

8    Amendment rights by retaliating against them for engaging in protected speech.  (*See id.*)

9    Defendants argue that Schacht and Wist are entitled to absolute immunity for their prosecutorial

10   conduct.  (Dkt. No. 4 at 9.)

11        1.  <u>Legal Standard for Prosecutorial Immunity</u>

12        Prosecutorial immunity is task dependent.  In other words, "the actions of a prosecutor

13   are not absolutely immune merely because they are performed by a prosecutor."  *Botello v.*

14   *Gammick*, 413 F.3d 971, 976 (9th Cir. 2005) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273

15   (1993)).  Immunity applies when a prosecutor is acting as an officer of the court, but not

16   necessarily when a prosecutor "engage[s] in other tasks, say, investigative or administrative

17   tasks."  *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009).  Accordingly, courts have found

18   absolute immunity does not apply when a prosecutor gives advice to police during a criminal

19   investigation, makes a statement to the press, or acts as a complaining witness in support of a

20   warrant application.  *Id.* at 343.

21        Courts engage a functional approach to decide whether absolute immunity attaches to a

22   particular kind of prosecutorial activity.  *Id.* at 342  This functional analysis considers how

23   closely linked an action is to the judicial process, with actions sharing "enough of the

24

1   characteristics of the judicial process" being entitled absolute immunity.  *Torres v. Goddard*, 793

2   F.3d 1046, 1051 (9th Cir. 2015).

3          Absolute immunity applies to tasks "intimately associated" with the judicial process,

4   including activities like deciding whether to initiate a judicial proceeding and appearing in court

5   to present evidence for a search warrant application.  *Van de Kamp*, 555 U.S. at 343.  Such

6   activities "necessarily require legal knowledge and the exercise of related discretion," *id.* at 344,

7   and would include management functions that "concern how and when to make impeachment

8   information available at trial" because they are "directly connected with the prosecutor's basic

9   trial advocacy duties." *Id.* at 346.  In short, all decisions involving evidence presented at trial are

10  "'intimately associated with the judicial phase of the criminal process.'"  *Id*. at 345 (quoting

11  *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).

12         When absolute immunity applies, it may deprive "a plaintiff of compensation that he

13  undoubtedly merits; but the impediments to the fair, efficient functioning of a prosecutorial

14  office that liability could create" lead to its continued application.  *Id*. at 348.  Hence, absolute

15  immunity "reflects 'a balance' of two 'evils'" in which the interest in protecting prosecutors

16  from potential harassment by unfounded litigation outweighs the interest in providing a legal

17  remedy for prosecutorial misconduct.  *Id.* at 341.

18         2.   Absolute Immunity Applies to Schacht and Wist's Prosecutorial Conduct

19         Considering the facts in the light most favorable to Plaintiffs, Schacht put Plaintiffs on

20  the *Brady* list based on information that did not qualify as PIE.  Rather, Schacht was motivated

21  to investigate and keep Plaintiffs on the *Brady* list because he held hostile animus towards

22  Plaintiffs for speaking out against PCPAO's alleged interference and supporting an opposing

23

24

1 | candidate for Sheriff.  (Dkt. No. 1-2 at 38-39.)  Nonetheless, maintaining a *Brady* list is part of a

2 | prosecutor's core role in the judicial process and, therefore, carries absolute immunity.

3 |       Prosecutors have a duty to provide favorable evidence to the defense about witness

4 | credibility when such information is known to a state actor, even if it is not known to the

5 | prosecutor.  *United States v. Bruce*, 984 F.3d 884, 895 (9th Cir. 2021).  In other words,

6 | prosecutors have an affirmative duty to become aware of evidence favorable to the defense as

7 | one of their necessary functions in our judicial system.  *See id.*  Investigating and maintaining

8 | *Brady* information, including information from and about police officers who may serve as state

9 | witnesses, is a necessary element of that duty, which means that prosecutorial immunity must

10 | also apply to those functions.  *See id.*; *Van de Kamp*, 555 U.S. at 344.

11 |       Indeed, it is well-established law that prosecutorial immunity applies to administrative

12 | and management duties, like information management, that are "directly connected with the

13 | conduct of a trial."  *Van de Kamp*, 555 U.S. at 344.  Decisions about whether to investigate and

14 | how to keep track of potential *Brady* information fits logically into this camp, a function that,

15 | though technically administrative, is intimately related to a prosecutor's obligations as an officer

16 | of the court.  *See id.*  As such, "[d]istrict courts in this Circuit addressing the issue of *Brady* Lists

17 | have found that prosecutors who made the decision to place officers on those lists and

18 | communicated those decisions were entitled to absolute immunity."  *Sampaga v. Snohomish*

19 | *Cnty.*, 2017 WL 2806836, at *2 (W.D. Wash. June 29, 2017); *see also Neri v. Cnty. of Stanislaus*

20 | *Dist. Attorney's Off.*, 2010 WL 3582575, at *8 (E.D. Cal. Sept. 9, 2010).  Therefore, Schacht's

21 | actions are covered by absolute immunity.

22 |       Wist is likewise entitled to absolute immunity.  Plaintiffs allege that Wist authored a no

23 | charges filed ("NCF") decision "replete with false accusations and erroneous conclusions."

24 |

1    (Dkt. No. 1-2 at 29.)  Wist "focused on [Plaintiff Darby] with a level of scrutiny consistent with

2    [Wist] having a hostile animus towards Darby or intentionally trying to be critical of Darby and

3    his supervising officer [Plaintiff Lieutenant] Fajardo."  (*Id.* at 30.)

4          A prosecutor's decision not to prosecute is intimately associated with the judicial phase

5    of process.  *Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 583 (9th Cir. 1997).

6    Accordingly, "a prosecutor is entitled to absolute immunity for the decision not to prosecute."

7    *Id.*  Wist's NCF decision constitutes action intimately associated with the judicial phase of

8    criminal process, and therefore, is immune (regardless of alleged hostile animus held toward the

9    officer involved in preparing and executing the warrant in the case).

10         Plaintiffs raise several arguments against absolute immunity; however, none are availing.

11   Plaintiffs argue that Schacht and Wist engaged in prosecutorial misconduct by acting with hostile

12   animus.  (Dkt. No. 8 at 11.)  However, this argument fails because, as stated above, the relevant

13   inquiry is not whether the prosecutor's complained of conduct amounted to misconduct, but

14   whether it was a function of their duties as an officer of the court.  If so, prosecutors have

15   immunity regardless of whether the actions were appropriate.  *See Van de Kamp*, 555 U.S. at 348

16   (noting that "[a] trial prosecutor would remain immune, even for *intentionally* failing to turn

17   over, say *Giglio* material").

18         Plaintiffs also argue that Wist and Schacht are not entitled to immunity because their

19   actions were administrative or akin to acting as a complaining witness.  (Dkt. No. 8 at 11–15.)

20   However, their argument misinterprets the administrative and complaining witness exceptions to

21   prosecutorial immunity.  Those exceptions exist to differentiate tasks that a prosecutor may do,

22   like making hiring decisions, doing payroll, or testifying as a witness, that are not necessarily

23   related to their role in the judicial system, from tasks that prosecutors do to support their "basic

24

trial advocacy duties." *Van de Kamp*, 555 U.S. at 344.  On the other hand, administrative or investigatory tasks done to support their prosecutorial duties to the court do have immunity.  *See id.*  To the extent that Wist and Schacht engaged in administrative and investigatory tasks, they were directly connected with duties to the court.

Plaintiffs contend that taking someone off the *Brady* list should be considered a task exempt from absolute immunity.  (Dkt. No. 8 at 17.)  However, removing an officer from the *Brady* list also requires legal analysis related to a prosecutor's duty to tender evidence.  Therefore, the Court does not find absolute immunity any less warranted for removal decisions.  As such, Wist and Schacht are entitled to absolute immunity and all individual claims against them should be dismissed.

3.  The Court Dismisses Plaintiffs' Claims Against Schacht and Wist In Their Official Capacity

In addition to suing Schacht and Wist individually, Plaintiffs bring Section 1983 claims against Schatch and Wist in their official capacity.  Insofar as Plaintiffs sue for damages, their claims are barred by the Eleventh Amendment.  Unless sovereign immunity is waived, the Eleventh Amendment prevents damage suits against states and state officials.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65, 71 (1989).  Although Schacht and Wist are employed by Pierce County, "[c]ourts have repeatedly found that district attorneys are state officers when exercising their prosecutorial functions and are therefore entitled to Eleventh Amendment immunity for suits for damages in their official capacities."  *Pendell v. Spokane Cnty., Washington*, 2020 WL 3270150, at *4 (E.D. Wash. June 17, 2020).  *See also Harris v. Chelan Cnty. Sheriff's Dep't*, 2019 WL 1923924, at *4 (E.D. Wash. Apr. 30, 2019).

On the other hand, the Eleventh Amendment does not preclude Plaintiffs from filing actions against state actors for prospective injunctive relief.  *Pendell*, 2020 WL 3270150, at *5

1   (citing *Ex Parte Young*, 209 U.S. 123, 159-60 (1908)).  In this case, Plaintiffs' prayer for relief

2   appears to seek three pieces of injunctive relief that apply specifically to Schacht and Wist.

3   Plaintiffs seek the following:

> 4   [A]n order enjoining Pierce County from opining that Det. Darby or Lt. Fajardo
>     violated Mr. Wales' federal or state due process rights; . . . an order enjoining
> 5   Pierce County from publication and dissemination of fabricated PIE, particularly
>     DPA Schacht's April 6 letter; an order finding defendants violated plaintiffs' First
> 6   Amendment and Due Process rights, and enjoining future violations.

7   (Dkt. No. 1-2 at 66.)

8           Injunctive relief in a § 1983 civil rights claim is considered an extreme measure.  *See*

9   *Lackey v. Lewis Cnty.*, 2009 WL 3294848, at *14 (W.D. Wash. Oct. 9, 2009).  "[E]ven where the

10  prayer for injunctive relief does not seek to enjoin the state criminal proceedings themselves, [the

11  Supreme Court has] held that the principles of equity nonetheless militate heavily against the

12  grant of an injunction except in the most extraordinary circumstances."  *Rizzo v. Goode*, 423 U.S.

13  362, 379 (1976).  Indeed, "a showing of an intentional and pervasive pattern of misconduct in

14  order to enjoin a state agency" is required for injunctive relief.  *Thomas v. Cnty. of Los Angeles*,

15  978 F.2d 504, 508 (9th Cir. 1992), *as amended* (Feb. 12, 1993).

16          Because the Court finds that Schacht and Wist's alleged conduct related to their *Brady*

17  obligations does not demonstrate an intentional and pervasive pattern of misconduct, it dismisses

18  Schacht and Wist as Defendants from this action.

19      **C.  Qualified Immunity**

20          Plaintiffs alleged "Pastor and Bomkamp disparaged [P]laintiffs publicly for political

21  reasons and took adverse actions against [P]laintiffs for engaging in protected activities."  (Dkt.

22  No. 8 at 26.)  Specifically, Pastor removed Plaintiffs from their SIU assignments in April 2020

23  and Bomkamp removed those Plaintiffs who were reassigned to SIU from their assignments once

24

1   more in July 2020.  Plaintiffs claim that Pastor and Bomkamp harbored hostile animus towards

2   Plaintiffs because they vocally supported Lieutenant Fajardo during her campaign for Sheriff.

3   (Dkt. No. 1-2 at 56.)  Further, Plaintiffs spoke out against "the impropriety of [D]efendants

4   shutting down the SIU on false allegations of wrongdoing and the costs of [D]efendants'

5   misconduct to the public specific to crime in Pierce County." (*Id.* at 51.)

6           1.   Legal Standard for Qualified Immunity

7           Government officials are entitled to qualified immunity from damages for civil liability in

8   42 U.S.C. § 1983 actions if their conduct does not violate clearly established statutory or

9   constitutional rights of which a reasonable person would have known.  *Pearson v. Callahan*, 555

10  U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified

11  immunity balances two important interests: the need to hold public officials accountable when

12  they exercise power irresponsibly and the need to shield officials from harassment, distraction,

13  and liability when they perform their duties reasonably.  *Harlow*, 457 U.S. at 815.  The existence

14  of qualified immunity generally turns on the objective reasonableness of the actions, without

15  regard to the knowledge or subjective intent of the particular official.  *Id*. at 819.  Whether a

16  reasonable officer could have believed his or her conduct was proper is a question of law for the

17  court and should be determined at the earliest possible point in the litigation.  *Act Up!/Portland

18  v. Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993).

19          In analyzing a qualified immunity defense, the Court must determine: (1) whether a

20  constitutional right would have been violated on the facts alleged, taken in the light most

21  favorable to the party asserting the injury; and (2) whether the right was clearly established when

22  viewed in the specific context of the case.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "The

23  relevant dispositive inquiry in determining whether a right is clearly established is whether it

24

would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Id*. The two steps need not be analyzed sequentially. *Pearson*, 555 U.S. at 234.

Instead, judges are "permitted to exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the circumstances

in the particular case at hand." *Id*.

> 2. Plaintiffs State a Claim for First Amendment Retaliation Against Pastor and
> Bomkamp

Defendants claim Plaintiffs fail to state a claim against Pastor and Bomkamp because

their actions are covered by qualified immunity. (Dkt. No. 4 at 12.) Defendants argue:

> Plaintiffs' response makes clear that the individual § 1983 claims against former
> Sheriff Pastor and Undersheriff Bomkamp are based on their *Brady* duty and
> cooperation in Deputy Prosecutor Schacht's *Brady* inquiry and determination. See
> Dkt. 8, p. 16 ("Plaintiffs counter that Pastor and Bomkamp had affirmative duties
> as an employer *not to act* on the misconduct from the prosecutor's office that
> exceeded the authority of that office and interfered with law enforcement matters."
> Emphasis added); *Id.* at p. 17 ("Plaintiffs are suing Pastor and Bomkamp *because
> they allowed* the prosecutor's office to intermeddle and take over police matters,
> damaging plaintiffs' careers." Emphasis added). There is no clearly established
> legal precedent that supports Plaintiffs' claims.

(Dkt. No. 9 at 6.)

Plaintiffs' broad allegations cited by Defendants above do not specify a constitutional

right at issue, but assuming their truth, it is not generally a constitutional violation to allow the

prosecutor's office to meddle in police matters. Further, to the extent that Plaintiffs' claim

against Pastor and Bomkamp involve them cooperating with PCPAO's *Brady* inquiry, Pastor and

Bomkamp are immune from liability. Police officers are equally bound by *Brady*'s disclosure

requirements. *Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015).

However, Defendants fail to account for Plaintiffs' claim that Pastor and Bomkamp

reassigned Plaintiffs out of SIU to less favorable assignments in retaliation for speaking to the

1    press, the police guild, and leadership about their disagreements with command staff and

2    PCPAO, as well as for endorsing Lieutenant Fajardo in her campaign for Sheriff.  (Dkt. No. 1-2

3    at 25–26.)  To this allegation, Defendants provided no rationale upon which to base qualified

4    immunity.

5          An employee states a First Amendment claim against a public employer by showing:

6    (1) the employee "was engaged in a constitutionally protected activity," (2) "the defendant's

7    actions would chill a person of ordinary firmness from continuing to engage in the protected

8    activity," and (3) "the protected activity was a substantial or motivating factor in the defendant's

9    conduct." *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *O'Brien v.*

10   *Welty*, 818 F.3d 920, 932 (9th Cir. 2016)).  To qualify as protected speech, a plaintiff must speak

11   in their capacity as a citizen; statements made pursuant to an employee's official duties are not

12   protected.  *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).

13         Additionally, the employee's speech must address a matter of public concern.  "To

14   address a matter of public concern, the content of the [officer's] speech must involve 'issues

15   about which information is needed or appropriate to enable the members of society to make

16   informed decisions about the operation of their government.'" *Desrochers v. City of San*

17   *Bernardino*, 572 F.3d 703, 710 (2009) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114

18   (9th Cir. 1983)).  *See, e.g., Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009) (reporting on

19   instances of possible corruption is a matter of public concern); *McKinley*, 705 F.2d at 1114

20   (speech dealing "with the rate of compensation for members of the city's police force and, more

21   generally, with the working relationship between the police union and elected city officials"

22   involved matters of public concern).  Speech limited to "an employee grievance concerning

23   internal office policy" is unprotected.  *Connick v. Meyers*, 461 U.S. 138, 154 (1983).

24

1

In their Complaint, Plaintiffs allege the following:

2

Plaintiffs responded to questions from the media, in particular the TNT, about narcotics investigations the use of ruses, and the necessity to protect confidential sources.  Plaintiffs spoke to the media about SSB 5714[2] and PCPAO's policy and the application of those policies and standards to narcotics investigations in Pierce County.  Plaintiffs spoke to the media about the impropriety of defendants shutting down the SIU on false allegations of wrongdoing and the costs of defendants' misconduct to the public specific to crime in Pierce County.  Plaintiffs shared with the media and otherwise defended the validity of their statistics in performing narcotics investigations in Pierce County and how shutting down their investigations compromised public health, safety, and welfare as evidenced by the statistics.

3

4

5

6

7

8

(Dkt. No. 1-2 at 51) (Footnote added).  (*See also supra*, Section II (citing Plaintiffs' quotes

9

published in TNT on July 15, 2020).)  Although Plaintiffs' allegations suggest further speech, no

10

other details are provided in the Complaint.  (*See generally* Dkt. No. 1-2.)

11

"Whether an employee's speech addresses a matter of public concern is a pure question

12

of law that must be determined 'by the content, form, and context of a given statement, as

13

revealed by the whole record.'"  *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1069 (9th

14

Cir. 2012) (quoting *Connick*, 461 U.S. at 147–48).  It is unclear at this stage whether Plaintiffs'

15

speech qualifies for protection, however, because the Court currently considers Plaintiffs' claim

16

on a motion to dismiss, it accepts as true Plaintiffs plausible allegation that they spoke out on a

17

matter of public concern.

18

Likewise, Plaintiffs allege that they suffered adverse employment actions because they

19

supported Lieutenant Fajardo in her campaign for Sheriff by attending public events, posting on

20

21

[2] Plaintiffs refer to Washington State Substitute Senate Bill 5714, effective July 28, 2019, which created protocols applied to informants.  SSB 5714 defines informants as "any person who a) was previously unconnected with the criminal case as either a witness or a codefendant; b) claims to have relevant information about the crime; c) is currently charged with a crime or is facing potential criminal charge or is in custody; and d) at any time receives consideration in exchange for providing the information or testimony."  (Dkt. No. 1-2 at 15) (internal quotations marks omitted.)  This definition was codified in the Revised Code of Washington 10.56.040(5).

22

23

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS - 15

1    the internet and social media, and solicited an endorsement from the Guild.  (Dkt. No. 1-2 at 22.)

2    Government employees maintain First Amendment protections to support candidates of their

3    choosing in an election.   "Ordinarily, an elected official cannot fire or retaliate against an

4    employee for his political opinions, memberships, or activities."  *Bardzik v. Cnty. of Orange*, 635

5    F.3d 1138, 1144 (9th Cir.2011).[3]

6         3.   <u>Defendants Pastor and Bomkamp Allegedly Violated Clearly Established Rights</u>

7         Having determined that Plaintiffs plead a plausible First Amendment retaliation claim,

8    we move to the second prog of the qualified immunity analysis.  "[A]s a general matter the First

9    Amendment prohibits government officials from subjecting an individual to retaliatory actions

10    . . . for speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256, (2006).  Further, "[t]he right to

11    speak freely without retaliation has long been clearly established for the purposes of qualified

12    immunity."  *Aydelotte v. Town of Skykomish*, 2020 WL 4347261, at \*5 (W.D. Wash. July 29,

13    2020), *appeal dismissed sub nom. Aydelotte v. Deschenmaeker*, 2020 WL 8571068 (9th Cir. Dec.

14    8, 2020).  *See also Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986) ("State action

15    designed to retaliate against and chill political expression strikes at the heart of the First

16    Amendment").

17         Accordingly, a reasonable official would have known that unfavorably transferring

18    Plaintiffs with retaliatory intent violates the First Amendment.  *See Quantz v. Edwards*, 264 F.

19    App'x 625, 628 (9th Cir. 2008) ("A transfer of job duties alone can constitute an adverse

20

21    _____
      [3] An exception to the rule against political retaliation exists for certain politically oriented

22    positions.  "Public officials do not violate the First Amendment when they deny for political
      reasons appointments or promotions to jobs that involve the making of policy or the giving of

23    confidential policy-related advice to a policymaker."  *Fuerst v. Clarke*, 454 F.3d 770, 772 (7th
      Cir. 2006).  However, neither party argues that Plaintiffs fulfill this limited exception, and

24    therefore, the Court assumes Plaintiffs do not occupy policy-making roles for the purposes of
      deciding Defendants' Motion to Dismiss.

1  employment action as long as it is reasonably likely to deter employees from engaging in

2  protected activity").  Because Plaintiffs alleged that retaliatory animus was the cause of Pastor

3  and Bomkamp's conduct, they are not entitled to qualified immunity at this stage in the

4  litigation.  However, Defendants may still move for summary judgment on the basis of qualified

5  immunity.  *See O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016).

6  **D. Plaintiffs' Conspiracy Claim is Dismissed**

7  Plaintiffs claim that Defendants collectively "agreed to and acted jointly to violate

8  [P]laintiffs' due process rights and to retaliate against [P]laintiffs for exercising their

9  constitutional First Amendment rights."  (Dkt. No. 1-2 at 56.)  Specifically, Plaintiffs alleged

10  "Defendants undertook a clandestine internal and external FBI investigation into [P]laintiffs

11  upon fabricated allegations of criminal corruption that had no basis in fact," and "fabricated

12  documents that contained false statements," including Schacht's April 6 letter and Wist's NCF

13  decision.  (*Id.*)

14  As previously discussed, Schacht and Wist's conduct is covered by absolute immunity as

15  it was prosecutorial in nature.  Further, Pastor and Bomkamp cooperation with PCPAO's *Brady*

16  inquiry is also subject to immunity.  Therefore, the conspiracy allegations Plaintiffs bring are

17  likewise covered by Defendants' immunity as the complained of actions involve *Brady*

18  investigations and subsequent listings.  Plaintiffs' allegations of conspiracy cannot invalidate

19  Defendants' absolute immunity defense.  *See Nix v. United States*, 2019 WL 77437, at *5 (W.D.

20  Wash. Jan. 2, 2019).  Accordingly, the Court is compelled to dismiss with prejudice Plaintiffs'

21  conspiracy claim against Defendants.

22

23

24

1

**E.  Plaintiffs Fail to State a Section 1983 Claim Based on Municipal Liability**

2

3        For the purposes of 42 U.S.C. § 1983, a local government unit may not be held

4  responsible for the acts of its employees under a respondeat superior theory of liability.  *Castro*

5  *v. Cnty. of Los Angeles*, 833 F.3d 1060, 1074 (9th Cir. 2016) (citing *Monell v. Dep't of Social*

6  *Services*, 436 U.S. 658 (1978)).  Accordingly, to state a claim against a municipality, a plaintiff

7  must allege the "constitutional deprivation was the product of a policy or custom of the local

8  governmental unit."  *Kirkpatrick v. Cnty. Of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016).  A

9  "policy" includes the acts of municipal policymaking officials.  *Connick v. Thompson*, 563 U.S.

10  51, 61 (2011).  To identify officials with final policy-making authority, the court should look to

11  state law.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988).  In lieu of an explicit

12  policy, a plaintiff may establish municipal liability based on a "custom," expressed as a

13  permanent and well-settled practice by the municipality, which gave rise to the alleged

14  constitutional violation.  *See id.* at 130.

15        In their Complaint, Plaintiffs alleged the following, which the Court construes as a claim

16  against Pierce County.

17        Custom and Usage: Defendants promulgated an official policy and developed a
        widespread custom and practice to eliminate discretionary authority of law
18        enforcement to investigate and process their investigations in accordance with law
        enforcement standards as opposed to prosecutor standards.   Defendants
19        promulgated informant policies and interpreted such policies in a manner that
        attempted to eliminate discretionary authority by law enforcement, particularly
20        concerning confidentiality of sources.  Defendants have promulgated 'PIE' policies
        [for the Sheriff's Department and PCPAO] that lack meaningful due process for the
21        involved state witness, and that those defendants have abused by fabricating 'PIE'
        and then denying plaintiffs any means to correct the false allegations or record or
22        be timely remorid [sic] from the 'Brady' or 'PIE' list.

(Dkt. No. 1-2 at 50.)

23

24

1    Defendants argue that Plaintiffs "identify no policy or practice that supports a

2  constitutional violation." (Dkt. No. 9 at 8.) The Court agrees that an official policy and

3  widespread custom that eliminates "discretionary authority of law enforcement" does not

4  sufficiently identify a constitutional violation. As previously stated, it is not generally a

5  constitutional violation to allow the prosecutor's office to involve itself in police matters. *See*

6  *supra*, Section III., Part C.2.

7    Regarding the Sheriff's Department and PCPAO PIE policies "that lack meaningful due

8  process," Plaintiffs fail to demonstrate how these policies caused the alleged constitutional

9  violation as required to state a claim for relief. *See Connick*, 563 U.S. at 60 (explaining that to

10 impose liability on a local government under Section 1983 the plaintiffs must prove that an

11 "action pursuant to official municipal policy" caused their injury). Indeed, Plaintiffs factual

12 allegations indicate that Defendants did not properly follow PIE policies or impermissibly

13 abused such policies. (*See* Dkt. No. 1-2 at 14) (Sheriff's Department "did not notify [P]laintiffs

14 of any identified PIE or otherwise comply with the policy"); (*see also* Dkt. No. 1-2 at 50)

15 ("Defendants Schacht and Wist abused the authority of their positions as set forth in state law

16 …"). Thus, it is not reasonable to infer the PIE policies caused the alleged constitutional

17 violation. Further, Plaintiffs' claim that such policies lacked meaningful due process is too

18 conclusory to establish any element of a due process claim.[4]

19

20 ────────────────────

[4] It is unclear from the Complaint whether Plaintiffs allege that Defendants violated their
21 Fourteenth Amendment rights to procedural or substantive due process. A due process claim is
not included in the causes of action plead and Plaintiffs do not allege a violation of the
22 Fourteenth Amendment. (*See generally* Dkt. No. 1-2.) However, Plaintiffs make passing
references to a lack of due process. (*See id.* at 13, 50, 65.) To the extent that Plaintiffs bring a
23 claim under 42 U.S.C. § 1983 for violations of Fourteenth Amendment due process, it is
dismissed for failure to state a claim. *See* Fed. R. Civ. P. 8(a)(2) ("[A pleading must contain] a
24 short and plain statement of the claim showing that the pleader is entitled to relief").

1    Accordingly, Plaintiffs' § 1983 claim based on municipal liability is DISMISSED.

2    Having dismissed this § 1983 claim, any claims for injunctive relief against Pierce County

3    premised on § 1983 likewise are DISMISSED.

4    **F.  Plaintiffs Fail to State a Basis for Declaratory Relief**

5    Plaintiffs seek a declaratory order under Washington's Uniform Declaratory Judgment

6    Act (UDJA), which declares "their rights, status, and legal relations under SSB 5714 . . . and

7    PCPAO's Confidential Informant Investigation Protocols . . . against Pierce County."  (Dkt. No.

8    1-2 at 46.)  Defendants argue "Plaintiffs' Complaint fails to establish any textual basis for

9    standing that would allow declaratory relief."  (Dkt. No. 9 at 7.)

10    The UDJA enables a person whose rights, status, or other legal relations are affected by a

11    statute to have any question of construction or validity arising under the statute determined by

12    the court.  Wash. Rev. Code § 7.24.020.  The Supreme Court of Washington established a two-

13    part test to determine standing under the UDJA: (1) "whether the interest sought to be protected

14    is arguably within the zone of interests to be protected or regulated by the statute or

15    constitutional guarantee in question[;]" and (2) "whether the challenged action has caused injury

16    in fact, economic or otherwise, to the party seeking standing."  *Grant Cnty. Fire Protection Dist.*

17    *No. 5 v. City of Moses Lake*, 83 P.3d 419, 423 (Wash. 2004) (internal quotation marks omitted).

18    In this case, Plaintiffs have not articulated a basis for their standing to seek a declaratory

19    order regarding SSB 5714 although they request clarification on the meaning of an "informant"

20    under the statute.  Codified as Revised Code of Washington 10.56.040, SSB 5714's protocols for

21    the use of informants does not address or regulate law enforcement—it refers only to county

22    prosecuting attorneys.  Further, the legislature's stated intent for passing such a law was "to

23    improve the quality of [informant witness] evidence and reduce the risk of wrongful conviction

24

1  related to these contributing factors."  Wash. Rev. Code § 10.56.010.  As a result, Plaintiffs do

2  not fall within the zone of interests to be protected or regulated by the statute, and they lack

3  standing under the UDJA.  Accordingly, the Court dismisses Plaintiffs' UDJA claim for

4  declaratory relief.

5  **G.  State Law Claims Against Pierce County**

6  Plaintiffs bring five state law claims against Pierce County for acts of its employees.

7  Plaintiffs' blacklisting claim is dismissed for failure to state a claim.  Plaintiffs' defamation –

8  false light, outrage, negligent infliction of emotional distress, and breach of contract claims may

9  proceed; however, Plaintiffs cannot base such claims on allegations for which Prosecutors Wist

10  and Schacht have absolute immunity.

11  Generally, under Washington law, the personal immunities of state officials do not extend

12  to government entities. *Babcock v. State*, 809 P.2d 143, 156 (Wash. 1991) (en banc).  However,

13  when a prosecutor is entitled to absolute immunity, Washington courts extend that immunity to

14  the County for policy reasons.  *Creelman v. Svenning*, 410 P.2d 606, 608 (Wash. 1966) ("The

15  public policy which requires immunity for the prosecuting attorney, also requires immunity for

16  both the state and the county for acts of judicial and quasi-judicial officers in the performance of

17  the duties which rest upon them.")  Because Schacht and Wist are entitled to

18  absolute immunity in relation to placing Plaintiffs on the *Brady* list, determining potential

19  impeachment evidence, and filing charges, their prosecutorial immunity extends to

20  the state law claims against Pierce County.

21  1. Illegal Blacklisting

22  Plaintiffs allege that Pierce County blacklisted them in violation of the Revised Code of

23  Washington § 49.44.010, which is a criminal statute.  *Neely v. Boeing Co.*, 2018 WL 2216093, at

1    *6 (W.D. Wash. 2018).  A criminal statute does not necessarily create a civil cause of action.

2    *See id.*  Plaintiffs fail to establish that Revised Code of Washington § 49.44.010 provides a

3    private cause of action.  Therefore, Plaintiffs' blacklisting claim should be dismissed.

4        2.   Defamation and False Light

5        Plaintiffs allege that Pierce County by and through its employees "published false and

6    misleading statements to [TNT] and throughout the criminal justice system about [P]laintiffs that

7    violated [P]laintiffs' privacy and placed them in a false light in the community."  (Dkt. No. 1-2 at

8    59.)

9        "To establish liability for defamation there must be a false and defamatory statement

10   concerning another, an unprivileged communication to a third party, fault amounting at least to

11   negligence on the publisher's part, and either actionability of the statement or special harm

12   caused by the publication."  *Eastwood v. Cascade Broad. Co*., 722 P.2d 1295, 1297 (Wash.

13   1986).  Similarly, a false light claim is based upon "someone publiciz[ing] a matter that places

14   another in a false light if (a) the false light would be highly offensive to a reasonable person and

15   (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in

16   which the other would be placed."  *Id.*  The torts of defamation and false light overlap "when the

17   statement complained of is both false and defamatory," but a "plaintiff need not be defamed to

18   bring a false light action[.]"  *Id.*  Thus, although distinct, the element of falsity is required for

19   both actions.

20       As previously discussed, Wist and Schacht have prosecutorial immunity for their actions

21   related to their duties to the court.  Plaintiffs cite to Schacht's letter to Bomkamp from April 6,

22   2020 as well as Schacht's letters to Plaintiffs in which he notified them they were placed on the

23   *Brady* list.  (Dkt. No. 1-2 at 59.)  However, the act of notifying Plaintiffs about a *Brady* concern

24

and investigation stems from prosecutorial duties to the court.  Therefore, prosecutors, and by extension Pierce County, are immune from suit based on these allegations.  Likewise, Wist's NCF opinion would be similarly immune from defamation and false light claims, as writing such an opinion is central to the prosecutorial role of deciding when to initiate a judicial proceeding.

Notwithstanding, Plaintiffs also cite to quotes made by Pierce County employees in TNT on April 24, 2020, July 15, 2020, and September 30, 2020.  Plaintiffs allege that the articles reported SIU "had to be 'disbanded' based on upon supposed investigative findings related to false police reports that Pierce County led reporters to believe were outside the scope of law enforcement authority and had no proper purpose." (Dkt. No. 1-2 at 60.)  Plaintiffs further allege that the "article reported that Pierce County Prosecutor Mary Robnett had declined to work with [P]laintiffs, as if their work was untrustworthy when it was not." (*Id.* at 61.)  Regarding the September 30, 2020 publication, TNT reported that Plaintiffs may have violated department policies and procedures, which Plaintiffs contend were false and misleading statements. (*Id.* at 60.)  Because the Court takes all of Plaintiffs' factual allegations as true, it assumes without deciding, that such statements were indeed false.  Therefore, Plaintiffs state a claim for defamation and false light against the remaining Defendants.

3. Outrage

Under Washington law, the elements of the tort of outrage are: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to plaintiff of severe emotional distress.  *Kloephel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003). Outrageous conduct does not include "mere insults, indignities, [or] threats."  *Id*. at 196. Outrage must stem from behavior that is "'*beyond all possible bounds of decency, . . . atrocious,*

1  *and utterly intolerable in a civilized community*."  *Robel v. Roundup Corp.*, 59 P.3d 611, 620

2  (Wash. 2002) (quoting *Dicomes v. State*, 782 P.2d 612, 630 (Wash. 1989)).

3          Pierce County's alleged outrageous conduct includes "discipline based on fabricated

4  allegations of multiple procedural and policy violations that were unfounded, except for minor

5  supposed technical violations," as well as "disparaging plaintiffs publicly and among the

6  criminal justice system to include disseminating false information to the media that the media

7  published that plaintiffs were corrupt, untrustworthy, dishonest, and otherwise incapable of

8  performing their job functions[.]"  (Dkt. No. 1-2 at 62.)  If true, such allegations could be

9  outrageous; thus, Plaintiffs' outrage claim may proceed.

10         4.  Negligent Inflection of Emotional Distress

11         To state a claim for negligent infliction of emotional distress under Washington law, a

12  plaintiff must plausibly establish duty, breach, proximate cause, damage, and "objective

13  symptomatology."  *Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 205 (Wash. 2014).  In other

14  words, a plaintiff must prove emotional distress susceptible to medical diagnosis and proven with

15  medical evidence.  *Kloepfel v. Bokor*, 66 P.3d 630, 632 (2003).  In an employment context,

16  courts have held "that an employer's conduct was unreasonable when its risk outweighs its

17  utility."  *Kumar*, 325 P.3d at 205.

18         As Plaintiffs' employer, Pierce County had a duty not to inflict emotional distress on its

19  employees.  Retaliating against Plaintiffs and causing them to lose employment opportunities, as

20  Plaintiffs allege, could constitute negligent infliction of emotional distress given that Plaintiffs

21  allegedly "suffered emotional distress evidenced by objective symptomatology, and for which

22  health care treatment was sought and provided," including "sleeplessness, nausea, fear,

23  nervousness, grief, anxiety, worry, mortification, shock, humiliation, and indignity."  (Dkt. No.

24

1   1-2 at 64.)  As with the other state law claims, however, Plaintiffs may not base this claim on

2   allegations for which prosecutors are immune.  Nonetheless, the Complaint sufficiently alleges

3   participation by other Pierce County officials to plausibly state a claim for relief.

4       5. <u>Breach of Contract</u>

5       The elements of breach of contract are (1) the existence of a contract between the parties,

6   (2) breach of that contract, and (3) harm to the plaintiff.  *Univ. of Wash. v. Gov't Employees Ins.*

7   *Co.*, 404 P.3d 559, 566 (Wash. Ct. App. 2017).

8       Plaintiffs state a claim for breach of contract based on their employment with Pierce

9   County.  They allege that Pierce County gave them certain assurances with their employment

10  contract and failed to meet those standards in a way that caused them harm.  Therefore, Plaintiffs

11  claim for breach of contract may proceed.  (Dkt. No. 1-2 at 65.)

12                          **IV.    CONCLUSION**

13      Having considered Defendants' motion, the briefing of the parties, and the remainder of

14  the record, the Court finds and Defendants' Motion to Dismiss (Dkt. No. 4) is GRANTED in part

15  as follows:

16      (1) Plaintiffs' 42 U.S.C. § 1983 claims against Schacht and Wist in their individual and

17          official capacity are DISMISSED with prejudice.

18      (2) Plaintiffs' conspiracy claim against Defendants is DISMISSED with prejudice.

19      (3) Plaintiffs' 42 U.S.C. § 1983 claim against Pierce County is DISMISSED without

20          prejudice.

21      (4) Plaintiffs' cause of action under the Washington Uniform Declaratory Judgment Act

22          is DISMISSED without prejudice.

23

24

1   (5)  Plaintiffs' state law claim against Pierce County for blacklisting is DISMISSED

2        without prejudice.

3   Defendants' Motion to Dismiss (Dkt. No. 4) is DENIED as to:

4   (1)  Plaintiffs' 42 U.S.C. § 1983 claims against Pastor and Bomkamp in their individual

5        and official capacities; and

6   (2)  Plaintiffs' state law claims against Pierce County for defamation, false light, outrage,

7        negligent infliction of emotional distress, and breach of contract.

8

9   Dated this 25th day of May 2022.

10

11

12                                      David G. Estudillo
                                        United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24