THE HONORABLE TIFFANY M. CARTWRIGHT

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CHRIS ADAMSON, an individual; JASON BRAY, an individual; LUCAS COLE, an individual; SHAUN DARBY, an individual; CYNTHIA FAJARDO, an individual; JAMES MAAS, an individual; DARRIN RAYNER, an individual; ELIZABETH REIGLE, an individual; RYAN OLIVAREZ, an individual<br><br>          Plaintiffs,<br><br>  vs.<br><br>PIERCE COUNTY, a local government; PIERCE COUNTY DEPUTY PROSECUTING ATTORNEYS JAMES SCHACHT AND FRED WIST, officially and individually; SHERIFF PAUL PASTOR, officially and individually; and ACTING SHERIFF AND UNDERSHERIFF BRENT BOMKAMP, officially and individually,<br>          Defendants. | No. 3:21-CV-05592-TMC<br><br>PLAINTIFFS' MOTION FOR RECONSIDERATION IN PART OF ORDER ON PLAINTIFFS' CR 37 MOTION ON SPOLIATION OF TEXTS, DKT. 203 AT 2, DENYING NEGATIVE INFERENCE<br><br>NOTED: May 8, 2024 within 14 days of the Court's Order dated May 3, 2024, Dkt. 203 |

## MOTION

Plaintiffs obtained newly discovered evidence on May 3, 2024, specifically work-related text messages, authored by Defendant Bomkamp, from his personal cell phone with other speaking agents for Pierce County (Hausner) on personal technology. Bomkamp testified in deposition that he did not text on work related matters on his group chat set up with the Sheriff's Department command on their personal devices. Bomkamp's dishonest testimony is evidence that should

weigh in favor of a spoliation instruction at trial. Defense counsel Cornelius' statement at the motion hearing that Bomkamp did not text was incorrect because Bomkamp admitted to texting, but denied doing so on personal technology, which plaintiffs are able to now prove is also not true. This new evidence weighs in favor of sanctions. Importantly, the Sheriff's Department has not completed its review and production of text messages responsive to the PRR, which may include texts responsive to request for production 20, 21, and 22 that are specific to plaintiffs and the matters at issue in this case. Pierce County has an affirmative duty to provide responsive texts, which Bomkamp previously testified falsely would not exist. Plaintiffs' motion is made pursuant to LCR 7 (h) and CR 60(b)(2), (3), and (6).

## FACTS

### Plaintiffs' Public Records Request

Pierce County Sheriff's Department has been processing plaintiffs' public records request of June 8, 2023 for all group text messages among Defendant Bomkamp and department command staff, Paul Pastor, Ed Troyer, Nick Hausner, Patti Jackson, Lauren Wallin, Kevin Roberts, Gary Sanders, Mike Blair and Micah Lundborg from personal or county owned technologies. Affixed Mell Dec. Ex. 1 (PRR Request). Plaintiffs submitted this public records request PRR P025140-060823 following Defendant Bomkamp's deposition wherein he testified to the text group among command on personal technology in his deposition May 17, 2023. Affixed Mell Dec. Ex. 2 (Bomkamp Dep.). To date, PCSD has produced eight installments. The eighth installment was produced on May 3, 2024, the day after the Court ruled on the spoliation motion. Affixed Mell Dec. The eighth installment contains work related texts among command to and from defendant Bomkamp and speaking agent Hausner and others. Affixed Mell Dec. Ex. 3 (Installment 8). PCSD has more to produce to include texts captured using Smarsh technology implemented November

PLAINTIFFS' MOTION FOR RECONSIDERATION IN PART OF ORDER
ON PLAINTIFFS' CR 37 MOTION ON SPOLIATION OF TEXTS, DKT.
203 AT 2, DENYING NEGATIVE INFERENCE - 2 of 7
Cause No. 3:21-CV-05592-TMC

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

15, 2021 for County owned technology.  Affixed Mell Dec. Ex. 4 (E-mail update on PRR). Texts

responsive to RFP 20, 21, and 22 may be in the texts not yet produced.  Pastor, Troyer, and Jackson

have denied retention of their work texts on personal technologies; other command staff in the

private technology group chat have retained and produced work texts among them using private

technologies.  Affixed Mell Dec. Ex. 5 (PRR Responses). The content of texts produced from

PSCD Command's group text on personal technology indicate defendants established and used

their personal cell phones to avoid detection.  Affixed Mell Dec. Ex. 3 and 5.  Defendants texted

about matters in litigation.  *Id.*  The texts produced so far date back to 2021 and 2022.

### Plaintiffs' Discovery Requests for Production No. 20, 21, 22

Since 2021, plaintiffs have sought text communications related to this case.  Dkt. 138 at

24.  RFP 20 and 21 requested text logs for communications about plaintiffs.  Dkt. 138 at 23-24.

RFP No. 22 sought texts about plaintiffs or the allegations in the Complaint from personal or work

owned technologies.  *Id.*  Defendants have not identified any responsive texts.  *Id.*

### Defendants' Preservation Obligations

Defendants knew plaintiffs had retained counsel for anticipated litigation in July of 2020.

Dkt. 1-2 at 135.  Plaintiffs filed their formal claims for damages on September 29, 2020.  Dkt. 1-

2 at 12, Dkt. 32 at 4.  Plaintiffs filed suit on July 26, 2021.  Dkt. 1 at 2.  As of November 17, 2021,

defendants attested they understood their obligations to preserve discoverable information.  Dkt.

14 at 5.

### Defendants' Destruction

Pierce County destroyed defendant Bomkamp's phones and the corresponding data such

as texts after anticipating litigation on September 2, 2020, May 10, 2021, and September 1, 2022.

Dkt. 138 at 120, 122, 137.  Bomkamp had four work phones during the relevant time period

PLAINTIFFS' MOTION FOR RECONSIDERATION IN PART OF ORDER
ON PLAINTIFFS' CR 37 MOTION ON SPOLIATION OF TEXTS, DKT.
203 AT 2, DENYING NEGATIVE INFERENCE - 3 of 7
Cause No. 3:21-CV-05592-TMC

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33

applicable to this case.  One work phone Bomkamp claimed "fell out of pocket while working in field on 11/21/21" that the department documented as lost on September 1, 2022.  Dkt. 138 at 137.  Bomkamp was Undersheriff and not likely working in the field at that time.  Pierce County similarly destroyed Pastor's phones, February 18, 2020, January 25, 2021, April 17, 2021.  Dkt. 138 at 120.  Bomkamp produced limited work texts from his personal phone in response to the PRR, not the RFPs.  Affixed Mell Dec. Ex. 5.  Pastor said he retained none.  *Id.* Jackson and Troyer have stated they did not retain work texts from their personal technology.  Affixed Mell Dec. Ex. 5.  Jackson is presently running against Fajardo for Sheriff since Troyer is not running.

### Defendants' Dishonesty

Defendants have deliberately misled plaintiffs and the Court about texting and never timely looked for responsive records.  Defendants may still have responsive records that they have failed to produce that have been compiled but not yet disclosed using Smarsh technologies implemented in November of 2021 in response to plaintiffs PRR Request.

On May 2, 2024, defense counsel Cornelius in opposition to the CR 37 motion stated Bomkamp did not text.  Bomkamp testified in deposition that he did text.  Affixed Mell Dec. Ex. 2. (Bomkamp Dep.).  Bomkamp testified that he did not text work texts with his command staff using his personal technology.  *Id.*  Bomkamp does text using his personal phone about work matters.  Affixed Mell Dec. Ex. 3 and 5 (Installment 4 and 8).  So does the County's speaking agent Nick Hausner, which he downplayed in his deposition.  *Id.* and Affixed Mell Dec. Ex. 6 (Hausner Dep.).  As of May 17, 2023, defendant Bomkamp had not searched for any texts responsive to RFP 20, 21, or 22.  Pastor was not well informed about the text practices of his office.  Affixed Mell Dec. Ex. 6. (Pastor Dep.)

### Plaintiffs' CR 37 Motion - Spoliation

PLAINTIFFS' MOTION FOR RECONSIDERATION IN PART OF ORDER
ON PLAINTIFFS' CR 37 MOTION ON SPOLIATION OF TEXTS, DKT.
203 AT 2, DENYING NEGATIVE INFERENCE - 4 of 7
Cause No. 3:21-CV-05592-TMC

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

Plaintiffs moved under CR 37 for a spoliation instruction. Dkt. 142. Plaintiffs moved for the instruction following several motions to compel discovery specific to text messages and the Court ordering Pierce County to produce requested text records and texts were not produced. RP 12/19/24. The Court denied the motion for sanctions on two grounds. The Court found the absence of any intentional wrongdoing and further was unable to find any texts relevant because responsive texts had not been produced or located from any other source to prove the existence of relevant records. Dkt. 203 and RP 5/2/224. This motion provides direct evidence of misconduct in that the witnesses have been deceptive and dishonest in addition to intentionally delaying substantive responses. Defendants' deception and dishonesty should not be left unaddressed. Plaintiffs have been denied access to text evidence that given the recent texts made available through the PRA provide constructive evidence that defendants likely hid relevant texts in this matter on personal technologies or on technologies that have since been destroyed.

## LEGAL ARGUMENT

The standard of proof for spoliation sanctions is preponderance of the evidence. *Fast v. GoDaddy.com, LLC,* 340 F.R.D. 326 (D. AZ 2022). Courts have inherent power to levy sanctions in response to abusive litigation practices. *Leon v. IDX Systems Corp.,* 464 F.3d 951 (9th Cir. 2006). Deliberately deceptive practices that undermine the integrity of judicial proceedings may be severely sanctioned because such intentional misconduct is "utterly inconsistent with the orderly administration of justice." *Id.* The failure to suspend automated destruction practices upon notice of litigation is sufficient to warrant instruction. *Apple Inc. v. Samsung Electronics Co., Ltd,* 888 F.Supp.2d 976 (N.D. Cal. San Jose Div. 2012). In the 9th Cir., the spoliation of evidence raises a presumption that destroyed evidence goes to the merits of the case and that such evidence was adverse to the party who destroyed it. *Id.* at 993. Too strict a standard of proof regarding the likely

PLAINTIFFS' MOTION FOR RECONSIDERATION IN PART OF ORDER
ON PLAINTIFFS' CR 37 MOTION ON SPOLIATION OF TEXTS, DKT.
203 AT 2, DENYING NEGATIVE INFERENCE - 5 of 7
Cause No. 3:21-CV-05592-TMC

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33

contents of the destroyed evidence would allow parties who have destroyed evidence to profit from that destruction. *Id.* citing *Residential Funding*, 306 F.3d at 109. It is not necessary to prove what was destroyed: "though neither Apple nor the Court may ever know the contents of any destroyed Samsung emails, the fact that the emails of key Samsung witnesses were among those destroyed permits the reasonable inference that Apple was prejudiced by Samsung's spoliation." *Id.* at 993. The appellate court concluded the following instruction appropriate:

> "Samsung Electronics Company has failed to preserve evidence for Apple's use in this litigation after its duty to preserve arose. Whether this fact is important to you in reaching a verdict in this case is for you to decide."

Plaintiffs have more evidence of abusive discovery practices by Pierce County in this matter than was evident in the *Apple Inc.* case where an instruction was authorized.

Here Pierce County has admitted that it destroyed the phones used by defendants Pastor and Bomkamp since it knew of the potential litigation. The destruction of their technologies and the failure to having even attempted to search such technologies prior to destruction evidences disregard of the discovery process. The new evidence now proves that Bomkamp testified untruthfully about his text practices and Hausner was deceptive as well. Given the new evidence of dishonesty and deception, plaintiffs renew their request for a spoliation instruction and request the Court sanction Bomkamp for his dishonesty.

## CONCLUSION

For the reasons previously stated, plaintiffs respectfully request the Court grant reconsideration and order sanctions and authorize a spoliation instruction and that Pierce County immediately produce any texts from the PRR search that mention plaintiffs or their claims in this litigation.

PLAINTIFFS' MOTION FOR RECONSIDERATION IN PART OF ORDER
ON PLAINTIFFS' CR 37 MOTION ON SPOLIATION OF TEXTS, DKT.
203 AT 2, DENYING NEGATIVE INFERENCE - 6 of 7
Cause No. 3:21-CV-05592-TMC

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

I, Joan K. Mell, certify this brief meets the word count requirements of less than the 2500 rule limit.

_____
Joan K. Mell, WSBA # 21319

Dated this 8th day of May, 2024 at Hamilton, MT.

III Branches Law, PLLC

_____
Joan K. Mell, WSBA #21319
Attorney for Plaintiffs

## AFFIXED DECLARATION

I, Joan K. Mell, make the following statement under oath subject to penalty of perjury under the laws of the State of Washington and the United States:

Attached are true and correct copies of the following documents:

Exhibit 1: Plaintiffs' PRR for Group Texts

Exhibit 2: Excerpted Bomkamp Deposition Testimony

Exhibit 3: PRR Installment 8 produced May 3, 2024.

Exhibit 4:  Public Records Officer Communications

Exhibit 5:  PRR Installments

Exhibit 6:  Excerpted Pastor and Hausner Depositions

Dated this 8th day of May, 2024 at Hamilton, Ravalli County, MT.

_____
Joan K. Mell
Attorney for Plaintiffs

PLAINTIFFS' MOTION FOR RECONSIDERATION IN PART OF ORDER
ON PLAINTIFFS' CR 37 MOTION ON SPOLIATION OF TEXTS, DKT.
203 AT 2, DENYING NEGATIVE INFERENCE - 7 of 7
Cause No. 3:21-CV-05592-TMC

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

EXHIBIT 1

Attention: Public Records

Pierce County Sheriff
3602 Pacific Avenue, Suite 100
Tacoma, WA 98418
EMAIL: SHRpublicrecords@piercecountywa.gov
FAX: (253) 798-7366



**Pierce County
Request for Access to
Public Records**

| Requests and production are governed by Chapter 42.56 RCW and Chapter 2.04 Pierce County Code (PCC) |
|---|

**Instructions:**
1. Complete Section A of the form. If you are requesting a list of individuals you must also complete Section B.
2. Mail, email, personally deliver, or fax completed form to the designated public records officer for the Pierce County Department/Office shown above.

| **SECTION A** | **Requester Contact Information/Description of Requested Records - Please PRINT** |
|---|---|

| Requester Name<br>Joan K. Mell | Business Name<br>III Branches, PLLC |
|---|---|

| Mailing Address<br>1019 Regents Blvd. Ste.  204 | City, State – Zip Code<br>Fircrest, WA 98466 |
|---|---|

| Phone Number<br>253-566-2510 | Fax Number<br>none | Email<br>joan@3brancheslaw.com |
|---|---|---|

**Method of Record Review. Please Select one:**

☐ Do not make copies, but arrange for in person inspection at department, PCC Chapter 2.04. I may request copies of specific records after in person review.

☐ Mail copies ☒ Email records via file transfer protocol ☐ Hold copies for pickup

Please describe the SPECIFIC record(s) you are requesting, including dates(s):

make available for public inspection all group text messages among Paul Pastor, Brent Bomkamp, micah Lundborg, Nick Hausner, Patti Jackson, Ed Troyer, Gary Sanders, Kevin Roberts, Lauren Wallin, mike Blair on work or personal technologies that relate to the conduct of government or the performance of any governmental or proprietary function from 2019 to the present date. Please provide affidavits per Nissen case for searches of private technologies. This request is for all group chats or conversations among all or some of the above listed employees.

6/8/2023

Signature of Requester                    Date Submitted

| **SECTION B** | **The following must also be signed ONLY if you request any list of individuals.** |
|---|---|

I declare under penalty of perjury under the laws of Washington that the following is true and correct: I will not use any requested list of individuals for a commercial purpose (profit expecting activity).

Signed this ___ day of _____, 202_ at _____ (city), ____ (state). RCW 42.56.070(8) and PCC 2.04.030(D)(4)

**Requester's Signature:** _____

PRR Form Rev. 9/2017

EXHIBIT 2

```
 1            So I'm going to instruct him not to.  I can give

 2    it to you separately, Joan, and I think that's

 3    sufficient.  You don't need to have it in this record.

 4            I question your motives for demanding that it be

 5    made in the record.  So I'm going to instruct the witness

 6    not to.

 7       Q   (By Ms. Mell)  Are you going to give me your

 8    phone number?

 9       A   On advice of counsel, I'm declining to answer

10    that question.

11       Q   Do you text from your personal phone?

12       A   Yes.

13       Q   Do you text command?

14       A   Occasionally.

15       Q   Okay.  And have you checked your personal cell

16    data to look for text responsive to the discovery

17    requests in this case?

18       A   No.

19       Q   Why not?

20       A   I don't use my personal phone for work-related

21    purposes.

22       Q   When you text command, do you ever comment about

23    work?

24       A   No.

25       Q   So if you need to talk to command about work,
```

 1   what do you do?

 2       A   I talk to them on my work phone or text them on

 3   my work phone.

 4       Q   Okay.  Did you search your work phone for

 5   content related to this case?

 6       A   I haven't yet.

 7       Q   Why not?

 8       A   I haven't had time.  I'm still working.

 9       Q   Have you been asked to search?

10           MR. CORNELIUS:  Object to form.

11           Go ahead and answer if you can answer.

12           THE WITNESS:  I believe there may be

13   something --

14           MR. CORNELIUS:  Again, I'll object to the extent

15   it calls for any attorney-client privilege.

16           But go ahead and answer to the extent that you

17   can.

18           THE WITNESS:  My recollection is there is a

19   request related to phone records, but I can't be

20   specific.

21       Q   (By Ms. Mell)  And do you know when you learned

22   that there was a request for your information?

23       A   Not specifically.

24       Q   Do you remember deliberately making this

25   decision not to respond to that request?

```
 1              MR. CORNELIUS:  Object to form.
 2         Go ahead and answer if you can answer.
 3              THE WITNESS:  I did not deliberately not
 4    respond.
 5      Q    (By Ms. Mell)  When do you intend to respond?
 6              MR. CORNELIUS:  Object to form.
 7         But go ahead and answer if you can answer.
 8              THE WITNESS:  I need to make it a priority the
 9    rest of this week and early next week to provide the
10    information that I can to my attorney.
11      Q    (By Ms. Mell)  Will you check your personal
12    phone just to be sure you don't have any work-related
13    communications there?
14              MR. CORNELIUS:  Object to the form.
15         Go ahead and answer if you can answer.
16         I believe this witness already testified
17    regarding that question.  So asked and answered too.
18         Go ahead and answer if you can answer.
19              THE WITNESS:  I will check.  I'm confident
20    there's nothing.
21      Q    (By Ms. Mell)  Did you call and text Paul Pastor
22    in 2020 in regards to the SIU?
23      A    I don't know.  I don't have any specific
24    recollection.  I don't ever remember texting Paul Pastor.
25      Q    When you say you don't ever remember texting
```

1   Paul Pastor, how did you communicate with Paul Pastor?

2        A    **Typically by phone or in person.**

3        Q    Why did you do it that way?

4        A    **That was the way that we typically communicated.**

5   **I don't have a reason.**

6        Q    Did you typically communicate that way so that

7   there would not be a written record subject to public

8   disclosure?

9             MR. CORNELIUS:  Object to form.

10            Go ahead and answer if you can answer.

11            **THE WITNESS:  No.**

12        Q    (By Ms. Mell)  Did you have you any issues

13   whether to text or talk in person or via telephone to

14   your colleagues?

15            MR. CORNELIUS:  Object to form.

16            But go ahead and answer if you can answer.

17            **THE WITNESS:  I typically don't text.  I**

18   **typically have conversations with people.  I'm not a**

19   **person that texts a lot.**

20        Q    (By Ms. Mell)  How many work phones have you had

21   since 2019?

22        A    **At least two.  Could be more.**

23        Q    Do they all have the same phone number?

24        A    **Yes.**

25        Q    And do you know how the department -- well,

 1    strike that.

 2          What is your practice with regard to the text

 3    messages you create on your work phone?

 4          MR. CORNELIUS:  Object to the form.

 5          Go ahead and answer if you can answer.

 6          THE WITNESS:  What is my practice with them?

 7    Q    (By Ms. Mell)  Yeah.

 8    A    My understanding is that they are captured

 9    through -- through the department's email system.  So

10    they are retained in that manner.  I don't retain

11    everything on my phone.

12    Q    So do you delete your texts?

13    A    Yes.

14    Q    You do that routinely?

15    A    I don't have a routine for when I do it, no.

16    Q    And you've deleted your texts since you were

17    issued a department phone?

18    A    Yes.

19          MR. CORNELIUS:  Object to form.

20          But go ahead and answer if you can answer.

21    Q    (By Ms. Mell)  And what do you know about the

22    department capturing texts in 2019?

23    A    I don't know when it started happening.

24    Q    Okay.  Do you think it's been fairly recent?

25    A    I don't know if it was before or after 2019.

```
 1        Q    Do you know if it was in relationship to the
 2   lawsuit against the department for deleting texts?
 3             MR. CORNELIUS:   Object to form.
 4             But go ahead and answer if you can answer.
 5             THE WITNESS:   I don't know if that was causal.
 6        Q    (By Ms. Mell)  Do you recall learning that texts
 7   were being deleted?
 8        A    Yes.
 9        Q    What did you do about it?
10             MR. CORNELIUS:   Object to form.
11             Go ahead and answer if you can answer.
12             THE WITNESS:   I didn't do anything about it.
13        Q    (By Ms. Mell)  Why not?
14             MR. CORNELIUS:   Same objection.
15             THE WITNESS:   I don't know.
16        Q    (By Ms. Mell)  Do you know if anybody did
17   anything about it?
18        A    No, I don't.
19        Q    Do you know now whether or not your texts that
20   you delete are being retained?
21        A    My understanding is they are, yes, through the
22   email system.
23        Q    And how are they being retained through the
24   email system?
25        A    I know that when there is a text on your phone,
```

```
 1    shortly thereafter, the text shows up in your email.
 2        Q    And then what do you do about the emails?  Are
 3    you able to delete the email?
 4        A    I can delete it from my personal account, but it
 5    never -- it's retained by the county.
 6        Q    How do you know that?
 7        A    That's what I've been told.  I don't recall from
 8    whom.
 9        Q    Have you ever performed any audit functions to
10    know whether or not it's working?
11        A    No.
12        Q    Do you remember who told you that?
13        A    No.
14        Q    Is it correct that that change in technology
15    occurred in 2022?
16        A    I don't know.
17        Q    Do you know whether phones that contain digital
18    data like text messages have been wiped out and wiped
19    clean, deleting text messages and communication data when
20    employees leave the department?
21             MR. CORNELIUS:  Object to form.
22             Go ahead and answer if you can answer.
23             THE WITNESS:  I don't know.
24        Q    (By Ms. Mell)  And do you know that IT wipes
25    clean the phones when they issue a new phone?
```

```
 1              MR. CORNELIUS:  Object to form.
 2              But go ahead and answer if you can answer.
 3              THE WITNESS:  I don't know that, no.
 4       Q    (By Ms. Mell)  Do you know what kinds of
 5    communications you create are subject to retention and
 6    how long?
 7              MR. CORNELIUS:  Object to form.
 8              But go ahead and answer if you can answer.
 9              THE WITNESS:  I don't know how long.  I'm
10    guessing if I sent emails, documents, notes; I believe
11    text messages, phone records.
12       Q    (By Ms. Mell)  Do you know how long the
13    retention schedule is for those communications you
14    create?
15              MR. CORNELIUS:  Object to form.
16              Go ahead and answer if you can answer.
17              THE WITNESS:  I don't know.  Seven years is
18    coming to my head, but I could be wrong.
19       Q    (By Ms. Mell)  Do you use Instant Messaging?
20       A    I don't even know what that is.
21       Q    Do you use any digital platforms that do not
22    continue to exist after receipt?
23       A    No.
24              MR. CORNELIUS:  Object to form.
25       Q    (By Ms. Mell)  Do you communicate through any
```

1  applications on your laptop with your command staff?

2       A    No.

3            MR. CORNELIUS:  Object to form.

4            THE WITNESS:  Not other than email.

5       Q    (By Ms. Mell)  Right.  I was asking about other

6  platforms than email.

7            Do you recall getting any texts in your email in

8  2020?

9       A    No.

10      Q    Have any of your staff been disciplined for

11 deleting text messages?

12      A    I don't think so.

13      Q    Is it against department policy to delete text

14 messages?

15      A    Possibly.  I don't know for sure.  It's a public

16 record; I would assume, yes.

17      Q    Is there a specific policy on texting within the

18 department?

19            MR. CORNELIUS:  Object to the form.

20            But go ahead and answer if you can answer.

21            THE WITNESS:  I don't know the specific policy.

22 My kind of vague recollection is it's -- texting can be

23 used for kind of nonspecific report-related things like,

24 hey, do you want to meet at such and such a coffee shop

25 or I'll be done in 10 minutes and we can go to lunch,

```
 1    those types of things.  And those types of things don't
 2    need to be retained.  Anything that's work related needs
 3    to be retained.
 4         Q   (By Ms. Mell)  Do you know about the Signal
 5    platform?
 6         A   The what?
 7         Q   An application called Signal?
 8         A   No.
 9             MR. CORNELIUS:  Object to form.
10         Q   (By Ms. Mell)  Do you group chat on your private
11    phone?
12         A   Yes.
13         Q   And do you group chat with colleagues from work?
14         A   Occasionally.
15         Q   And who is in your group chat?
16             MR. CORNELIUS:  Object to form.
17             But go ahead and answer if you can answer.
18             THE WITNESS:  I don't know for sure.  I think
19    it's probably the sheriff, Lauren Wallin, Eddy Jackson,
20    Nick Hausner, Kevin Roberts, Micah Lundborg, possibly
21    Gary Sanders.
22         Q   And what's this group chat called?
23             MR. CORNELIUS:  Object to form.
24             But go ahead and answer if you can answer.
25             THE WITNESS:  I don't think it has a name.
```

Adamson, et al vs Pierce County
Bomkamp, Brent - May 17, 2023                                          Page 61

```
 1        Q    (By Ms. Mell)  And how do you use it?
 2             MR. CORNELIUS:  Object to form.
 3             But go ahead and answer if you can answer.
 4             Are you talking about currently, Joan?  Are you
 5   talking about currently?
 6        Q    (By Ms. Mell)  Ever.
 7             MR. CORNELIUS:  Object to form.
 8             But answer if you can answer.
 9             THE WITNESS:  I don't have any specific
10   recollection right now of what it was used for.  It
11   wasn't work related.  I know that because there's been
12   discussion about dump use that's for work-related
13   activity.
14        Q    (By Ms. Mell)  Okay.  But they are all
15   coworkers; right?
16        A    Yes.
17        Q    Okay.  And was that group chat established for
18   political reasons?  So you could be politically
19   supportive of one another?
20             It didn't come into being with the campaign?
21             I think that was a no.
22             These individuals you identify, do you consider
23   them your peer group, I mean, like friends?
24        A    Yes.
25        Q    So you socialize with them?
```

Adamson, et al vs Pierce County
Bomkamp, Brent - May 17, 2023

Page 62

```
 1        A    Can you be specific on what you mean by
 2   socialize?
 3        Q    Off-work-hours activities together.
 4        A    No.
 5        Q    Okay.  So then what is the purpose of your group
 6   chat with your coworkers on your private phone?
 7        A    I can't even recall what the topic was the last
 8   time we all did it.
 9        Q    Was it intended to allow you to communicate
10   without it being a public record?
11        A    No.
12        Q    Was it intended to -- I'll strike that.
13             What do you recall the group chatting about?
14        A    I can't recall anything right this particular
15   moment.
16        Q    Are you able to look at your phone and tell or
17   refresh your recollection right now?
18        A    I don't have it with me.
19        Q    I would ask that you revisit that group chat.
20   And if there's any content that in any way relates to
21   county business, that it be made available.
22             MR. CORNELIUS:  I'll object to form.
23             MS. MELL:  What's the objection?
24             MR. CORNELIUS:  Again, Joan, I don't think that
25   has any relevance to this proceeding.  And to the extent
```

```
 1   that you're asking something that goes beyond this
 2   deposition or anything involving this proceeding that I
 3   have an objection to.  I think he's answered the
 4   question.
 5        MS. MELL:  He says he couldn't recall, Frank.
 6     Q   (By Ms. Mell)  Back to Blair.
 7        Were you involved in what he disclosed to the
 8   press?
 9     A   I don't have a specific recollection of
10   discussing it.  I know that if we responded to the press,
11   we likely did so with counsel.  It was an agreement as to
12   how we would respond to inquiries from the press.
13     Q   So tell me about that agreement.
14        MR. CORNELIUS:  Object to form, to the extent
15   that it requires disclosure of attorney-client privilege.
16        To that extent I would instruct the witness not
17   to answer.  To the extent that he can answer, go ahead
18   and answer.
19        THE WITNESS:  I'm not sure just what happened
20   here.
21        I guess on advice of counsel, I'm declining to
22   answer.
23        MS. MELL:  Frank, do you want to revisit that
24   objection, given your motion?
25        MR. CORNELIUS:  Which motion are you referring
```

EXHIBIT 3



9:21

7 People >

May 20, 2022 at 3:08 PM

Gary Sanders

211-17 to ratify contract                    3:08 PM

Lauren Wallen

Thanks for the update!                        3:09 PM

Nick Hausner

Cool! Confirming it has
already been approved by                      3:10 PM
the Council?

Brent Bomkamp

The funding's been
approved by the council but
the council will have to                      3:10 PM
approve the contract

Nick Hausner

Ok.  Matt Barry just
contacted me, provided me
his contact information to                     3:11 PM
start the background for his
reinstatement.

Text Message





9:22

7 People ›

**Nick Hausner**

What were the dates for the retention bonus payments again? June 13 and June 14, 2023?

**Brent  Bomkamp**

The MO you was signed by all parties today.

This year the initial one time payment will be made to employees who are active on the county's payroll as of June 13, 2022, and the payment will be made in pay cycle 13 which I believe is around July 1 payday.

For 2023 if you're on the county payroll June 12, 2023 the second $5000 bonus be paid in pay cycle 13

Text Message





9:23

7 People >

Gary Sanders

**Little wins!!!!**

Nick Hausner

What were the dates for the retention bonus payments again? June 13 and June 14, 2023?

Brent Bomkamp

The MO you was signed by all parties today.

This year the initial one time payment will be made to employees who are active on the county's payroll as of June 13, 2022, and the payment will be made in pay cycle 13 which I believe is around July 1 payday.

For 2023 if you're on the county payroll June 12, 2023 the second $5000 bonus be paid in pay cycle

Text Message



**Nick Hausner**

What were the dates for the retention bonus payments again? June 13 and June 14, 2023?

3:14 PM

**Brent Bomkamp**

The MO you was signed by all parties today.

This year the initial one time payment will be made to employees who are active on the county's payroll as of June 13, 2022, and the payment will be made in pay cycle 13 which I believe is around July 1 payday.

For 2023 if you're on the county payroll June 12, 2023 the second $5000 bonus be paid in pay cycle 13

3:17 PM



9:33

GS
LW
7 People >

couple wanting more but then reality was explained to them and overall I think yes votes.

GS

May 12, 2022 at 6:38 PM

Nick Hausner

Just FYI I've got the civil service commission having a special meeting next week to do two things. Number one provide us authorization for blanket approval for reinstatements from the time of the approval next week until the end of the year. Second, to authorize out of state lateral candidates to be hired by the sheriff's office.

NH

Excellent

Brent Bomkamp

BB  Wow!! Great job!

+   Text Message







9:39

GS
NH  LW  BB
7 People

any Christmas cards from pirnie or Joan.

5:36 PM

Nick Hausner

We just ended for the day. Sheriff you are on at 10 tomorrow morning, please show up a little early for briefing from Jenn.

5:47 PM

I just spoke to Jet Houn Who left us to go to Olympia PD. The sheriff and I just received an email from Jet requesting to come back to our department. I told him that we would be happy to have him back. We will discuss tomorrow further what that looks like. He's not happy with the culture so he would like to come back.

6:41 PM

Text Message





9:39

7 People

ET  I'll be there ..

Nick Hausner
How long has he been gone?

Ed Troyer
ET  4 weeks

Nick Hausner
Yeah, I was going to say he just left. It has to go to the commission before he can be in reinstated I will have sherry put it on the agenda for next month. We just need a letter from him asking to be reinstated.

Micah Lundborg
Send a letter to Matt Berry in Lacey too

Nick Hausner
I have that draft

Text Message



**9:40**

**7 People** >

Nick Hausner

I have that draft reinstatement letter put together, I think the sheriff wants me to add that they will get the retention bonus if they're employed at the time of the payments. We just need to get a list of individuals that we want to send it to.

Micah Lundborg

Liked "I have that draft reinstatement letter put together, I think the sheriff wants me to add that they will get the retention bonus if they're employed at the time of the payments. We just need to get a list of individuals that we want to send it to."

Ed Troyer

Also I have a few little edits

Text Message



**Ed Troyer**

Also I have a few little edits to do .. I'll do them tonight.

**Lauren Wallen**

Loved "I just spoke to Jet Houn Who left us to go to Olympia PD. The sheriff and I just received an email from Jet requesting to come back to our department. I told him that we would be happy to have him back. We will discuss tomorrow further what that looks like. He's not happy with the culture so he would like to come back."

**Ed Troyer**

Let's get that process and everything down tomorrow asap so we are all on same page and don't over



9:40

7 People

Ed  Troyer

Let's get that process and everything down tomorrow asap so we are all on same page and don't over promise . Make sure we don't get I trouble..

Nick Hausner

Okay

Ed  Troyer

1. Do they get their old seniority back? Unit numbers

2. Since the county approved the 10 G  retention bonus is there a effective date, if so what happens if they come after. Does the letter of intent lock them in?

3. Do they have to start over on years for promotional purposes?

Text Message



9:40

7 People >

Ed Troyer

1. Do they get their old
seniority back? Unit
numbers

2. Since the county
approved the 10 G retention
bonus is there a effective
date, if so what happens if
they come after. Does the
letter of intent lock them in?

3. Do they have to start over
on years for promotional
purposes?

4. If they went to TPD we
should consider them
traders and the answer is no
😎

3. If they went to TPD

Nick Hausner

Yes, I believe they do... I will
check on details

Text Message





**Nick Hausner**

I think because it is, "reinstatement" they get seniority, etc. back. Will check with Sherry tomorrow.

**Gary Sanders**

Would they lose seniority for time gone? So if they are gone two months, they would essentially fall to the end of their hire group and anyone hired within two months of their hire group.

**Nick Hausner**

I think so as they were in unpaid status.

That's makes sense.

**Ed Troyer**

Yikes those are the things we need to get done and get guild buy off asap.. I know

9:41

GS
NH  LW  BB
ML        ET

**7 People >**

Ed Troyer

Yikes those are the things we need to get done and get guild buy off asap.. I know we are all busy but if we can push things off and make sure we are good when the contract gets approved next Friday that would be good..

Nick Hausner

On it!

Ed Troyer

Liked "On it!"

A target date on the bonus would help figure out who's wanting to come back

Nick Hausner

Yes, we have a draft mou for the bonus. We just need dates for payments from HR.

Text Message



9:41

7 People

**Nick Hausner**

On it!

**Ed Troyer**

Liked "On it!"

A target date on the bonus would help figure out who's wanting to come back

**Nick Hausner**

Yes, we have a draft mou for the bonus. We just need dates for payments from HR.

**Ed Troyer**

Just as long as we have the reinstated date that makes it work and the path to get there.

**Brent Bomkamp**

I just asked Amy when she thinks the bonus will be paid

Text Message



9:47

7 People >

$2500 he bailed out on yesterday

Lauren Wallen

👏

That was total BS

Ed Troyer

Like I said our guy would have been out on admin leave longer then he would be in jail ..

Gary Sanders

Misprint in court documents????

Patti Jackson-Kidder

No ... not sure of all details ... not in text format

Gary Sanders

Gotcha

Text Message

EXHIBIT 4

**Subject:** [Records Center] Sheriff :: P025140-060823
**Body:**
Joan -

I received your message, and the most recent installment were some text messages from personal devices, specifically, Hausner's and Bomkamp and an email from Pastor saying he had no messages.

Thanks.

Candice

**Wednesday, May 8, 2024 at 17:15:26 Mountain Daylight Time**

| | |
|---|---|
| **Subject:** | Public Record Request P025140 (Text Messages) |
| **Date:** | Wednesday, May 8, 2024 at 9:02:14 AM Mountain Daylight Time |
| **From:** | Candice Mauracher |
| **To:** | Joan Mell |
| **Attachments:** | image001.jpg, image002.jpg |

Joan,

I understand you are having significant issues with GovQA.  Per our agreement, I am transmitting all installments via GovQA and will also start transmitting via OneDrive.  Please download the records send in OneDrive as they have an expiration date.

As you know, initially I was working on producing text messages that were captured in SMARSH but you asked that I turn my focus to the personal phones which was done beginning with installment #4.  The outline for the records is below.  Please note I am still working on revieing Chief Roberts' messages and I will then move on to Lundborg and finally I will go back to SMARSH.

**FROM GovQA**

**To date, we have released to you the following installments:**

**Installment 1:**
**Text Messages**

**Date Produced:**
**09/06/2023 (payment received 09/05/2023)**

**Pages:**
**1-272**

**Installment 2:**
**Text Messages**

**Date Produced:**

**11/27/2023**

**Pages:**
**271-445**

**Installment 3:**
**Text Messages**

**Date Produced:**
**12/01/2023**

**Pages:**
**446-730**

**Installment 4:**
**Bomkamp & Hausner Text Messages & Pastor's Response**
**Regarding Text Messages**

**Date Produced:**
**03/12/2024 (payment received)**

**Pages:**
**731-991**

**Installment 5:**
**Wallin & Blair Text Messages**

**Date Produced:**
**04/15/2024**

**Pages:**
**992-1013**

**Installment 6:**
**Sanders Text Messages & Emails from Jackson and Troyer**
**Regarding Text Messages**

**Date Produced:**
**04/22/2024**

**Pages:**
**1014-1022**

**Installment 7:**
**Roberts Text Messages**

**Date Produced:**
**04/25/2024**

**Pages:**
**1023-1028**

**Installment 8:**
**Roberts Text Messages**

**Date Produced:**
**05/03/2024**

**Pages:**
**1029-1093**

**At this time, we are prepared to produce an installment of records.**

**If exemptions to disclosure were identified and applied, please see the corresponding exemption log for further information.**

**These records do not meet the fee threshold; therefore, these records are produced to you at no cost and released to you via the Public Records Request Portal. Please log back into**

the "My Request Center" within the portal to access all released records. Select this request and select "View Files".

Pursuant to RCW 42.56.120(4) and Pierce County Code 2.04.040(H) if you do not inspect or retrieve these records made available to you through the County web portal or file transfer protocol service within 30 calendar days, by Tuesday, June 4, 2024, after receiving this notice of the availability of the records, this agency may stop providing further installments of records and close out the request.

It will take additional time for us to review all the files that may contain records responsive to your request and to determine which records or portions of records, if any, are exempt pursuant to law. Accordingly, we estimate that we will be providing the next installment of records to you on or before Wednesday, May 22, 2024.

I will notify you if records are available sooner, more time is required to complete the search for responsive records, or if additional clarifying information is needed from you.  If you have any questions, believe we have somehow misunderstood your request(s) or wish to clarify your request, please do not hesitate to contact me.  To respond via the Public Records Portal, open this request "Details" page and send a "New Message".

Sincerely,
Candice M
Public Records Officer
Pierce County Sheriff

Let me know if you have any issues with downloading any of the records from OneDrive.  I have added all 8 installments to the Drive and will send you the invite to the records immediately following this email.

Thank you!



*Candice Mauracher*

Public Records Officer, CPRO | Legal Assistant IV
253-798-4800
Pierce County Sheriff's Department
SHRpublicrecords@piercecountywa.gov

NOTICE OF PUBLIC DISCLOSURE: This email account is public domain. Any correspondence from or to this email account may be a public record. Accordingly, this email, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.

EXHIBIT 5

Candice Mauracher

**From:** Ed Troyer
**Sent:** Monday, January 8, 2024 3:15 PM
**To:** Candice Mauracher
**Subject:** RE: Public Records Request (P024880)

I do not have any.

**From:** Candice Mauracher <candice.mauracher@piercecountywa.gov>
**Sent:** Monday, January 8, 2024 1:44 PM
**To:** Patti Jackson <patti.jackson@piercecountywa.gov>; Gary Sanders <gary.sanders@piercecountywa.gov>; Kevin Roberts <kevin.roberts@piercecountywa.gov>; Ed Troyer <ed.troyer@piercecountywa.gov>
**Subject:** RE: Public Records Request (P024880)

I have not received the text messages from your personal phones as requested. I sent a reminder on 11/30/2023. I still need messages from you all from your personal phones. Please get me screen shots of the messages by Friday, January 19, 2024. I would like to close this request by the end of the month. Thanks!



*Candice Mauracher*
Public Records Officer, CPRO | Legal Assistant IV
253-798-4800
Pierce County Sheriff's Department
SHRpublicrecords@piercecountywa.gov

NOTICE OF PUBLIC DISCLOSURE: This email account is public domain. Any correspondence from or to this email account may be a public record. Accordingly, this email, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.

**From:** Candice Mauracher
**Sent:** Monday, June 12, 2023 2:49 PM
**To:** Brent Bomkamp <brent.bomkamp@piercecountywa.gov>; Nick Hausner <nick.hausner@piercecountywa.gov>; Micah Lundborg <micah.lundborg@piercecountywa.gov>; Patti Jackson <patti.jackson@piercecountywa.gov>; Gary Sanders <gary.sanders@piercecountywa.gov>; Kevin Roberts <kevin.roberts@piercecountywa.gov>; Lauren Wallin <lauren.wallin@piercecountywa.gov>
**Subject:** Public Records Request (P024880)
**Importance:** High

I have received the below request:

"Make available for public inspection all group text messages among Paul Pastor, Brent Bomkamp, Micah Lundborg, Nick Hausner, Patti Jackson, Ed Troyer, Gary Sanders, Kevin Roberts, Lauren Wallin, or Mike

PCSD P025140 Mell                                                                                    001019

Blair on work or personal technologies that relate to the conduct of government or the performance of any governmental or proprietary function from 2019 to the present date. Please provide affidavits per Nissen case for searches of private technologies. This request is for all group chats or conversations among all or some of the above listed employees."

Requestor:       Joan Mell
Email:            joan@3brancheslaw.com
Phone #:          253.566.2510

I need you to all check your work cell phones for any and group text messages as outline herein above.  Additionally, please check your private cell phones for group messages regarding the same as outlined herein above.  The end date should be May 24, 2023.

I will need to hear back from you all no later than Friday, June 23, 2023.  Thank you!



*Candice Mauracher*

Public Records Officer, CPRO │ Legal Assistant IV
253-798-4800
Pierce County Sheriff's Department
SHRpublicrecords@piercecountywa.gov

NOTICE OF PUBLIC DISCLOSURE: This email account is public domain. Any correspondence from or to this email account may be a public record. Accordingly, this email, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.

PCSD P025140 Mell                                                                                001020

Candice Mauracher

---

| | |
|---|---|
| **From:** | Patti Jackson |
| **Sent:** | Monday, January 8, 2024 1:51 PM |
| **To:** | Candice Mauracher; Gary Sanders; Kevin Roberts; Ed Troyer |
| **Subject:** | RE: Public Records Request (P024880) |

==I checked and did not have any work related text saved on my personal phone so I did not have to send== to you.  I do ==know that I'm supposed to forward everything== to my work related phone from that point forward.

Thank you - Pj



==Chief Jackson==
**Pierce County Sheriff Department |Patrol Operations**
Phone 253-798-2299

**From:** Candice Mauracher <candice.mauracher@piercecountywa.gov>
**Sent:** Monday, January 8, 2024 1:44 PM
**To:** Patti Jackson <patti.jackson@piercecountywa.gov>; Gary Sanders <gary.sanders@piercecountywa.gov>; Kevin Roberts <kevin.roberts@piercecountywa.gov>; Ed Troyer <ed.troyer@piercecountywa.gov>
**Subject:** RE: Public Records Request (P024880)

I have not received the text messages from your personal phones as requested.  I sent a reminder on 11/30/2023.  I still need messages from you all from your personal phones.  Please get me screen shots of the messages by Friday, January 19, 2024.  I would like to close this request by the end of the month.  Thanks!

*Candice Mauracher*

Public Records Officer, CPRO  |  Legal Assistant IV
253-798-4800
Pierce County Sheriff's Department
SHRpublicrecords@piercecountywa.gov

NOTICE OF PUBLIC DISCLOSURE: This email account is public domain. Any correspondence from or to this email account may be a public record. Accordingly, this email, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.

**From:** Candice Mauracher
**Sent:** Monday, June 12, 2023 2:49 PM
**To:** Brent Bomkamp <brent.bomkamp@piercecountywa.gov>; Nick Hausner <nick.hausner@piercecountywa.gov>; Micah Lundborg <micah.lundborg@piercecountywa.gov>; Patti Jackson <patti.jackson@piercecountywa.gov>; Gary Sanders <gary.sanders@piercecountywa.gov>; Kevin Roberts <kevin.roberts@piercecountywa.gov>; Lauren Wallin <lauren.wallin@piercecountywa.gov>
**Subject:** Public Records Request (P024880)
**Importance:** High

# I have received the below request:

PCSD P025140 Mell                                                                                                                    001021

"Make available for public inspection all group text messages among Paul Pastor, Brent Bomkamp, Micah Lundborg, Nick Hausner, Patti Jackson, Ed Troyer, Gary Sanders, Kevin Roberts, Lauren Wallin, or Mike Blair on work or personal technologies that relate to the conduct of government or the performance of any governmental or proprietary function from 2019 to the present date. Please provide affidavits per Nissen case for searches of private technologies. This request is for all group chats or conversations among all or some of the above listed employees."

Requestor:      Joan Mell
Email:          joan@3brancheslaw.com
Phone #:        253.566.2510

I need you to all check your work cell phones for any and group text messages as outline herein above.  Additionally, please check your private cell phones for group messages regarding the same as outlined herein above.  The end date should be May 24, 2023.

I will need to hear back from you all no later than Friday, June 23, 2023.  Thank you!



*Candice Mauracher*

Public Records Officer, CPRO | Legal Assistant IV
253-798-4800
Pierce County Sheriff's Department
SHRpublicrecords@piercecountywa.gov

NOTICE OF PUBLIC DISCLOSURE: This email account is public domain. Any correspondence from or to this email account may be a public record. Accordingly, this email, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.

2

Candice Mauracher

| | |
|---|---|
| **From:** | Paul Pastor <04pastor@gmail.com> |
| **Sent:** | Monday, October 30, 2023 12:51 PM |
| **To:** | Candice Mauracher |
| **Subject:** | Re: Public Record Request P024880 |

Ms. Mauracher:
I have nothing.  I intentionally did not keep anything of the sort.
Thank you for seeing to this.

Paul Pastor

On Wed, Oct 25, 2023 at 1:29 PM Candice Mauracher <candice.mauracher@piercecountywa.gov> wrote:

Good afternoon!


We have received a public record request from Attorney Joan Mell asking for the following records:


Make available for public inspection all group text messages among Paul Pastor, Brent Bomkamp, Micah Lundborg, Nick Hausner, Patti Jackson, Ed Troyer, Gary Sanders, Kevin Roberts, Lauren Wallin, or Mike Blair on work or personal technologies that relate to the conduct of government or the performance of any governmental or proprietary function from 2019 to the present date. Please provide affidavits per Nissen case for searches of private technologies. This request is for all group chats or conversations among all or some of the above listed employees.


Can you please let me know if you have any text message records as requested hereinabove by the close of business Wednesday, November 1, 2023?  The timeframe is 01/01/2019 – 05/24/2023.  If you have records I will need copies of the text messages ASAP following November 1, 2023.

1

Thank you and I hope you are doing well!



*Candice Mauracher*

Public Records Officer, CPRO | Legal Assistant IV

253-798-4800

Pierce County Sheriff's Department

SHRpublicrecords@piercecountywa.gov

NOTICE OF PUBLIC DISCLOSURE: This email account is public domain. Any correspondence from or to this email account may be a public record. Accordingly, this email, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.

PCSD P024880 & P025140 Mell

000732



10:00   .ıll 5G 🔋

4 People >

Text Message
Mon, Feb 20 at 10:55 PM

Ed  Troyer

Just getting home from long day. Here's what's going on. I don't have access to my work phone or computer.  I need info for council deal on pursuits, they want me there. I was at 25th Rs tonight and council members and state reps were there.  So let me known here what deal is.

PCSD P025140 Mell                                    001070



PCSD P025140 Mell                                    001072



PCSD P025140 Mell                                                                001074



**10:10**

ET  NH
LW

**3 People** ›

Text Message
Fri, Feb 17 at 4:29 PM

Ed Troyer

This came from Dave Morrel today. Are we aware of this?

Also have you seen the councils performance audit review of police pursuits ?
I would like some insight before the special meeting that Ryan is calling for next Tuesday at 5pm.
If you need a copy I can forward you the email.

Nick Hausner

Lauren was given a heads up, today.

I just forwarded to you email.

Ed Troyer

Ok thanks and Dave is

Text Message





10:10

ET
NH
LW

3 People >

have talked about it a couple of times in our Monday meeting, but I think it might have been in the fall when you were out.

Nothing earth shattering in there. I've been working on preparing talking points all day and will continue throughout the weekend. Will send to you all, Gary and Micah once it's done.

Nick Hausner

Thanks!

Ed  Troyer

Ok , just that Ryan calling special meeting. I'm always Leary

Thanks for the work

Bruce says Ryan wants to go anti pursuit in his own

+          Text Message



10:38

ET
Ed >

Who was he to her ? Good deal!
5:44 PM

I believe boyfriend or ex-boyfriend, not 100% positive yet what the relationship just yet.
5:56 PM

Ok thanks . Any word on Ruston deal
6:23 PM

No updates.  Still looks like it could be self inflicted, but still trying to track down the other male with the victim. Video from the area you can hear 12 shots total. Possible they were just popping off rounds.  We spent 2 days there and could fine other casings though.
6:25 PM

Could or could not
6:27 PM

Sorry. Could not find other

iMessage



10:38

**ET**

Ed ›

boyfriend, not 100% positive yet what the relationship just yet.   5:56 PM

Ok thanks . Any word on Ruston deal   6:23 PM

No updates.  Still looks like it could be self inflicted, but still trying to track down the other male with the victim. Video from the area you can hear 12 shots total. Possible they were just popping off rounds.  We spent 2 days there and could fine other casings though.   6:25 PM

Could or could not   6:27 PM

Sorry. Could not find other casings.  The looked on two separate days in the daylight.   6:28 PM

iMessage







9:08            .ıll 5G 🔋

ET
Ed ›

Mar 24, 2021 at 10:52 AM

Hey Ed.... this is Ronee from the Ram, you gave me your number years ago and I hope this is still it.

I need some help and I'm hoping you can help me. My Mother in law was the lady killed on Friday evening in the accident on 72nd and Pioneer. She was bringing my kids dog home to us after she had watched him while we were on vacation. Our dog ran from the scene and was missing for two days we finally got him back and now he is in the hospital fighting for his life.

To say the least our family has been through some serious trauma over the last few days, our kids lost their

iMessage



9:08

ET

Ed ›

To say the least our family has been through some serious trauma over the last few days, our kids lost their grandma and my husband lost his mom. Fatal Drunk driving accidents have become a regular thing in our area lately. As part of our healing process we want to make a cross place it at the scene but we are terrified to have our kids out on that corner. We were wondering is there was anyway you could help us close part of the road or get a few officers out there to protect us as we say goodbye to our loved one. We would really like to get the media involved and make a statement about drunk driving and how it has destroyed our family, but we are unsure if that is even

10:52 AM

iMessage



officers out there to protect us as we say goodbye to our loved one. We would really like to get the media involved and make a statement about drunk driving and how it has destroyed our family, but we are unsure if that is even possible. What are your thoughts? Is any of this even possible? Thank you for your time and I look forward to hearing from you. Please call me if you're have time to talk.

We'll take care of it.                    10:54 AM

Thanks .. someone can get ahold of her and help that would be great and have our media team follow it would bring good awareness to the issue.          10:58 AM





9:13

ET

Ed >

So for the arson, the ATF is assisting, the FBI will join tomorrow. They are still pulling videos and doing interviews no suspect description yet. For the shooting in Ruston, still trying to locate the other individual that was with the victim. We still do not know if it was self-inflicted or not it appears that way but no way to tell for sure. As far as the Lakewood deal that all ended with a canine contact. We assisted but they were the lead as it was their case there chase so we were just there to help where needed. But that one sounded wild

6:14 PM

What started Lakewood deal?

6:19 PM

iMessage



EXHIBIT 6

HAUSNER – PC SPEAKING AGENT

1     Q    Dishonest statement by any plaintiff.

2     A    I'm thinking -- I'm thinking not.

3     Q    Okay.  Can you identify any Pierce County

4  Sheriff's Department policy, regulation, procedure, or

5  protocol you allege was violated by any plaintiff and was

6  a reason for reassigning any plaintiff from 2019 forward?

7          MR. CORNELIUS:  Object to form.

8          THE WITNESS:  No.

9     Q    (By Ms. Mell) Can you talk about Pierce County's

10 retention and preservation of text messages after 2019?

11    A    Yes.  What would you like to know?

12    Q    Explain to me the practice and procedure --

13 well, I guess we can start with, who all is assigned text

14 capabilities on county technology within the department?

15    A    Anybody that's issued a department cell phone

16 would have the ability to text.  The department cell

17 phone is a -- standard issue is the iPhone.  There are

18 some flip phones that we issue out on occasion for

19 special circumstances.  But generally they are iPhones

20 and they all have texting capabilities.

21          So anybody that is issued a phone -- and not to

22 insinuate that everybody in the sheriff's department is

23 issued a phone, because they are not.  But I believe --

24 well, all commissioned staff are.

25    Q    What is the policy with regard to use of text

1   messages?

2      A   What is -- there is no policy in our policy

3   manual regarding the use of text messages.

4      Q   Is there anything in the policy that prohibits

5   use of personal technology for work purposes?

6      A   There's nothing in policy the prohibits using

7   personal technology for work, purposes that I'm aware of.

8      Q   How does Pierce County retain work-related texts

9   from personal technology?

10     A   So if somebody uses their personal phone for

11  personal reasons, it's up to that individual to retain

12  the text messages in some fashion.  How they do that is

13  independent of them.

14     Q   Are you on a text chain with command staff on

15  your personal phone?

16     A   I don't have, like -- I know some people have,

17  like, established text groups.  I don't have established

18  text groups, but I have been involved in text messaging

19  between other command staff members.

20     Q   Does that include Bomkamp?

21     A   Yes.

22     Q   And have you looked for and turned those over in

23  this case as to any that relate to this indication?

24       MR. CORNELIUS:  Object to form.  Beyond the

25  scope.

```
 1          THE WITNESS:  I have reviewed my text messages
 2   recently, and I don't believe I have any text messages
 3   related to this case.
 4      Q   (By Ms. Mell) Did -- with regard to work
 5   technologies and texting, were the texts stored anywhere,
 6   captured and stored?
 7      A   Not that I'm aware of.  At the time in 2020, no.
 8      Q   Are they now?
 9      A   Text messages are stored now on work-related
10   technologies.
11      Q   How are they stored?
12      A   They are stored using a system called Smarsh.
13   And what Smarsh does is captures all text messaging --
14          MS. MELL:  I'm sorry.  There's somebody who has
15   been arrested that I'm trying to make sure they are okay.
16   So hold on just a second.  I'm sorry.
17          THE WITNESS:  Absolutely.  Give me a chance to
18   eat my granola bar.
19          MS. MELL:  Okay.  I think that will be the last
20   interruption.  They were released, so we should be good.
21      Q   (By Ms. Mell) When did you adopt Smarsh?
22      A   I believe it was in 2021.
23      Q   Why was it adopted?
24      A   To have a way to archive text messaging.
25      Q   Is it because of this case?
```

```
 1        A    I don't believe it was because of this case.

 2        Q    Was this case a factor in the decision to adopt

 3   Smarsh?

 4             MR. CORNELIUS:  Object to form.  Beyond the

 5   scope.

 6             THE WITNESS:  I'm not aware that it was.

 7        Q    (By Ms. Mell) Were you involved in the

 8   decision-making to adopt Smarsh?

 9        A    I've always had an interest in having the

10   ability to capture text messages.  But as far as the

11   decision-making process with Smarsh, I was not involved.

12        Q    Were Pastor's texts deleted?

13             MR. CORNELIUS:  Object to form.

14             THE WITNESS:  I'm not sure if Pastor had any

15   texts.  I know that during my tenure with Sheriff Pastor,

16   I never -- I don't think I ever got a text from him.  I

17   don't think he was a texting person.

18        Q    (By Ms. Mell) Was there a protocol in place

19   before you got to Smarsh to capture texts on work

20   technology before the phone was decommissioned?

21        A    No.

22        Q    So when was Pastor's phone decommissioned?

23        A    Let me clarify.

24             MR. CORNELIUS:  Object to form.  Beyond the

25   scope.
```

```
 1            THE WITNESS:  Let me clarify on the first one
 2    before we move onto that one.
 3            I'm not sure when -- exactly when Smarsh came in
 4    and when exactly I authorized the purchase of some
 5    equipment in our information technology unit to capture
 6    information from phones when they are turned in.  So that
 7    started happening before Smarsh came into effect.
 8       Q    (By Ms. Mell) Do you know whether or not you
 9    captured text messages in any capacity before Pastor's
10    phone was recommissioned?
11       A    I didn't understand the question.  Did we
12    capture?
13       Q    Taken out of commission, not recommissioned.
14    Taken out of commission?
15       A    I don't know.
16            So prior to having these two different
17    technologies, Smarsh and the IT unit's ability to capture
18    some information when a phone was turned in, prior to
19    that, there was no technology to capture text messages.
20            Is that what you were looking for?
21       Q    I think I understood that, but I'm trying to
22    understand the time frame of it.
23       A    Yeah.  So Smarsh was in '21.  I think in maybe
24    the third quarter, but I'm not exactly sure.  It might
25    have been a little bit later than that.  And then prior
```

1    to that, we bought a -- some technology for our IT unit

2    to capture when people turned in their phones, to be able

3    to capture information that was on the phone.  And then

4    prior to that, there was nothing.

5         Q    Okay.  So were you capturing information from

6    Pastor's phone when it was taken out of service?

7              MR. CORNELIUS:  Object to form.  Beyond the

8    scope.

9              MS. MELL:  How is that beyond the scope, Frank?

10   It's in 5.

11             MR. CORNELIUS:  You're asking -- where in 5,

12   Joan?  Where does it talk about Pastor's phone in 5?

13             MS. MELL:  Pierce County's retention and

14   preservation of text messages after 2019.

15             Whose do you think I'm talking about?

16             MR. CORNELIUS:  I'm going to object to form.

17   Beyond the scope.

18             THE WITNESS:  I think it's -- I think the

19   question was Pastor's phone and capturing texts from his.

20             Is that correct, Ms. Mell?

21        Q    Yes, it is.  Thank you.

22        A    I believe that it's unlikely that any of his

23   text messages, if there were any, were captured by either

24   one of these technologies, Smarsh or the prior one that I

25   mentioned.

```
 1      Q    What about Nordstrom?

 2           MR. CORNELIUS:  Object to form.  Beyond the

 3   scope.

 4           THE WITNESS:  Nordstrom's texts or phones?

 5   Yeah, I'm not sure.

 6      Q    (By Ms. Mell) How about Nielsen?

 7      A    Same.  I'm --

 8           MR. CORNELIUS:  Object to form.  Beyond the

 9   scope.

10           THE WITNESS:  Yeah, I'm not sure.

11      Q    (By Ms. Mell) How about Blair?

12           MR. CORNELIUS:  Object to form.  Beyond the

13   scope.

14           THE WITNESS:  Yeah, I don't think so because I

15   believe -- like I said, this Smarsh was implemented in

16   late third or fourth quarter of '21, around there.  And

17   then this other technology was just shortly before that.

18           And depending on when they turned in their

19   phones or when they got new phones or replaced, would

20   indicate when that earlier technology was used because

21   that only captures the text messages when the phone is

22   turned into the IT unit.

23           Smarsh is kind of automated as they happen, and

24   this prior technology is only when the phone is turned

25   in.
```

1    Q    And when you got that prior technology when the

2    phones were turned in, was it when the phone was taken

3    out of use, did you capture all of the texts before

4    deleting it?

5    A    Yeah.  So whatever was on the phone when it was

6    turned in, would have been captured with the new

7    technology.

8    Q    So how do you capture texts for case reports?

9    A    I don't know what you mean "for case reports."

10   Q    Well, in law enforcement investigations, if the

11   investigators are using texts, how do those texts become

12   part of the investigation?

13   A    They could be incorporated into the police

14   report.  They could take pictures of the texts.

15   Q    But they weren't routinely made part of the

16   investigation?

17   A    I don't know.  I don't think I've ever used text

18   messaging myself in an investigation.

19   Q    So do you know how the prosecutor's office

20   obtained texts from my clients relative to Peres --

21   A    I believe --

22   Q    -- and for Benitez?

23   A    I believe the phones were provided to -- or

24   taken and potentially downloaded.

25   Q    Okay.  So my clients' phones were confiscated

```
 1        A    I don't know.

 2        Q    How were the tasks assigned?

 3        A    I don't recall.

 4        Q    Do you remember getting Ryan Olivarez's phone?

 5        A    Yes, perhaps.  Yes.  Yes, I do.  Yep.

 6        Q    So did internal IT to the sheriff's department

 7    search those phones?

 8        A    I don't know who searched the phones.

 9        Q    Were they just -- where did you take the phone

10    when you got it and phones you got?

11        A    I don't recall specifically, but probably to the

12    undersheriff.

13        Q    Was anyone from the prosecutor's office there?

14        A    Not that I recall.

15        Q    Did you give any information from the phones to

16    the prosecutor's office?

17        A    Not that I recall.

18        Q    Who searched their phones?

19        A    I'm not sure.

20        Q    What information was taken from their phones?

21        A    I'm not sure.

22        Q    Would metadata exist to ascertain the dates of

23    destruction of text messages from any of the key

24    witnesses in the case?

25             MR. CORNELIUS:  Object to form.  Beyond the
```

1       A   I have the one that I already provided and then
2   just this one, I think.
3       Q   Okay.
4       A   I don't think I did any of these.
5       Q   All right.  So I'll switch gears for a minute
6   here.
7       A   Do you want me to finish with these policies?
8       Q   No.
9           Can you identify any policy on there that speaks
10  directly to retaining communications such as texts or
11  emails of the sheriff or undersheriff?
12      A   No, there's no policy regarding text messaging.
13      Q   How about emails?
14      A   There is an email policy.  That's Policy 212.
15      Q   What's the retention requirements for email?
16      A   So the department -- there's actual retention
17  set by the State and then there's what the county does.
18  So the county is the one who manages the entire email
19  system for the entire county.  And I believe that email
20  is retained for at least six years by the county.
21      Q   Okay.  What facts, if any, were known to Pierce
22  County specific to each plaintiff that would suggest any
23  plaintiff was corrupt?
24          MR. CORNELIUS:  Object to form.
25          THE WITNESS:  So in my mind, corruption means,

PASTOR

```
 1        workday.
 2   Q    So when you were at headquarters --
 3                (Reporter requests clarification.)
 4   Q    BY MS. MELL:  Where were you situated -- when you were
 5        at headquarters, where were you situated?
 6   A    There was an office designated as the sheriff's office,
 7        and I occupied that.
 8   Q    From your office at the sheriff's department, how did
 9        you perform your job functions relative to technologies
10        that you utilized?
11                MR. CORNELIUS:  Object to form.
12                THE WITNESS:  With regard to technologies, I
13        had access to a cell phone, a computer, and a laptop.
14   Q    BY MS. MELL:  No tablets?
15   A    Yes.  And, actually, the computer that I had access to
16        was a laptop, a computer which I plugged into a
17        computer port and the -- I also had a tablet, which I
18        had access to and used.
19   Q    And so when you said, "computer" and "laptop," is that
20        one piece of hardware?
21   A    Actually, again, it was an issue of docking a laptop.
22   Q    Okay.  So you didn't have a separate desktop,
23        standalone computer?
24   A    Yes.
25   Q    And did you carry two phones or one phone?
```

```
 1   A     I believe I carried one phone.  There may have been

 2         times when I carried a personal cell phone.

 3   Q     Do you remember your phone number?

 4   A     I do not.  I'm sorry.

 5   Q     Did it text?

 6   A     I believe, at that time, it texted, but I didn't.  I'm

 7         not the greatest technological person.

 8   Q     Was there any prohibition against text messaging during

 9         your tenure?

10   A     I don't recall whether there was or not.

11   Q     What was your practice in preserving text messages?

12   A     I will not be able to answer that out of ignorance.  I

13         don't know.

14               (Reporter requests clarification.)

15               MS. MELL:  I didn't hear the objection.  Was

16         there one?

17               MR. CORNELIUS:  Object to form.

18               MS. MELL:  What's the objection to form?

19               MR. CORNELIUS:  Yes, there was.

20               MS. MELL:  Yeah.  Why?  What's wrong with the

21         form of the question?

22               MR. CORNELIUS:  -- in evidence.  It assumes

23         facts not in evidence, Joan, and he testified that he

24         didn't text; so that was the basis.

25               MS. MELL:  But he receives texts; so --
```

```
 1              MR. CORNELIUS:  If you want to clarify your
 2       question, you can clarify your question.  I believe it
 3       was vague as well.
 4              MS. MELL:  Oh, okay.
 5   Q   BY MS. MELL:  Was the phone that was work-related that
 6       you used for work issued by the County?
 7   A   Yes, it was.
 8   Q   Do you know what kind of phone it was?
 9   A   Oh, goodness.  I think I had three in all -- during my
10       tenure, since we changed out a couple of times.  And
11       no, I don't -- I don't recall the brand.  I think I had
12       a non-flip phone by the end of my tenure.
13   Q   Do you know whether or not it was backed up to cloud
14       storage?
15   A   I don't know the answer to that.
16   Q   Do you know what your obligations are when acting as an
17       elected official to retain your communications?
18   A   I'm not recalling specifics of that, no.
19   Q   Do you know that there's a retention schedule
20       applicable to your communications as sheriff?
21   A   I believe, in general, I know that communications need
22       to be -- need to be reserved and preserved.
23   Q   Do you know how long?
24   A   I do not.
25   Q   What did you do to ensure that your communications were
```

Adamson, et al vs Pierce County
Pastor, Paul - June 08, 2023

Page 12

```
 1        retained and preserved in conformance with retention
 2        laws?
 3   A    I did not do anything beyond relying on my people who
 4        were in charge of data and data preservation in the
 5        agency.
 6   Q    So who's that?
 7   A    I'm sorry?
 8   Q    Who's your "people"?
 9   A    I don't recall names.  I'm sorry.
10   Q    Did you ever have a conversation with anyone about
11        making sure your communications were retained in
12        compliance with the law?
13   A    I don't recall having conversations or not having
14        conversations.  I don't recall.
15   Q    Did they work for you?
16   A    Yes.
17   Q    So the people you relied on were sheriff's department
18        employees?
19   A    That is true.
20   Q    But you don't remember any of them at this point?
21   A    I'm sorry.  I don't.
22   Q    Do you remember ever having any communications with any
23        of them?
24   A    I may have, but I recall no specific communication.
25   Q    Do you recall ever having done anything to ensure that
```

```
 1          your communications were properly retained?
 2                   MR. CORNELIUS:  Object to form.
 3                   THE WITNESS:  I just could tell you I have no
 4          recollection of discussions about that.  They may have
 5          taken place, but it's been quite a long time.
 6     Q    BY MS. MELL:  Do you know whether or not your text
 7          communications would be routed into your email?
 8     A    I don't know the answer to that.
 9     Q    Do you remember getting texts from anyone?
10     A    I probably did, but I don't remember specifically.
11          And, as I said, I was technologically a bit backwards;
12          so did not do a great deal of texting myself or any
13          texting myself.
14     Q    Were you part of any group text?
15     A    You know, I don't recall whether I was or was not.
16     Q    Did you use any instant messaging programs to
17          communicate?
18     A    I don't know the answer to that.  In fact, I'm not sure
19          I know what an instant messaging program is.  I'm
20          sorry.
21     Q    Did you -- strike that.
22              Did you utilize any technical or software systems
23          that allowed you to communicate with a group of your
24          subordinates from your tablet or your phone without
25          calling them?
```

```
 1                MR. CORNELIUS:  Object to form.
 2                THE WITNESS:  I know that I emailed people
 3       and emailed them about meetings or emailed them about
 4       questions of particular projects that were ongoing.
 5   Q   BY MS. MELL:  Do you recall having any, like,
 6       Microsoft Teams program?  Are you familiar with
 7       anything like that?
 8   A   I'm sorry.  I don't -- I'm not familiar.
 9   Q   Did you use your personal cell phone to communicate
10       with any of your subordinates?
11   A   I do not believe -- I know I didn't do it regularly
12       because I tried to reserve my personal cell phone for
13       family calls.
14   Q   Have you searched your personal cell phone for any
15       communication data related to this lawsuit in response
16       to the discovery propounded to the County?
17   A   I have not.
18   Q   Why not?
19   A   Well, number one, it did not occur to me.  And number
20       two, I got a new cell phone shortly after I left, a new
21       personal cell phone.
22   Q   What kind of personal cell phone did you get?
23   A   I got an iPhone.
24   Q   Did you have an iPhone before?
25   A   You know, I'm sorry.  I can't recall whether I did or
```

1           **did not.**

2    Q    Do you have a cloud for your personal data?

3    A    I believe there is data that I'm storing currently on

4         the cloud.  I don't know if that goes through my cell

5         phone, but I know there is storage on the cloud from my

6         personal computer at home.

7    Q    And do you know whether or not that dates back to your

8         tenure with Pierce County?

9    A    I believe the question was to -- was to personal cell

10        phone and saving on the cloud.  And, again, the

11        personal cell phone is new after I left the County.

12   Q    Well, you had a personal cell phone before, you just

13        don't remember what it was; right?

14   A    Right.

15   Q    Okay.  So do you remember whether or not you were

16        cloud-storing data from the cell phone you had prior to

17        leaving the County?

18   A    I'm sorry.  I do not.

19   Q    And is it correct that you have not searched -- well,

20        strike that.

21             What do you have in terms of technology at home?

22        A laptop or desktop?

23   A    I have a desktop, and I have a tablet.

24   Q    And what's the tablet?  Is it -- Apple product?  Or

25        other?