1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

13

CHRIS ADAMSON, et al.,

14

                    Plaintiffs,

15

        v.

16

PIERCE COUNTY, et al.,

17

                    Defendants.

18

Case No. 3:21-cv-05592-TMC

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

19
20

## I.    INTRODUCTION

21
22
23
24

In April 2020, the Pierce County Sheriff's Department (PCSD) shut down its narcotics

trafficking investigations team, the Special Investigations Unit (SIU). Pierce County Sheriff Paul

Pastor transferred Plaintiffs, who were SIU officers, to other units and launched an external

investigation into the alleged misconduct. The shutdown came after the Pierce County

Prosecuting Attorney's Office (PCPAO) raised concerns about the SIU's adherence to protocol, including confidential informant disclosure requirements. It also came within a month of the filing deadline for the Pierce County Sheriff election. Pastor decided to reopen the SIU in July 2020 and transferred back all Plaintiffs except Lieutenant Cynthia Fajardo and Sergeant Shaun Darby. But Pastor and Undersheriff Brent Bomkamp closed the unit again just three days later, almost immediately after publication of an article in the News Tribune (also referred to as "Tacoma News Tribune") that revealed Plaintiffs had spoken to the press about the matter. Plaintiffs' suit raises First Amendment retaliation claims against Pastor and Bomkamp, and state law claims for defamation, false light, negligent infliction of emotional distress, intentional infliction of emotional distress, and breach of contract against Pierce County.

Before the Court is Defendants' motion for summary judgment (Dkt. 131) and motion to strike improper surreply (Dkt. 199). Having considered the parties' briefing and the balance of the record, the Court concludes that (1) Plaintiffs have not put forth evidence from which a jury could conclude the April 2020 shutdown was motivated by protected First Amendment activity; (2) Under the *Pickering* balancing test, Plaintiffs' right to speak to the News Tribune is outweighed by the PCSD's legitimate interests in performing its mission; and (3) Plaintiffs have not put forth evidence from which a jury could find in their favor on any state law claim.  The Court therefore GRANTS the Defendants' motion for summary judgment. The Court also GRANTS the motion to strike an improper surreply and STRIKES the Declaration filed at Dkt. 197.[1] A pending motion for reconsideration (Dkt. 208) of the Court's earlier order denying Plaintiffs' request for an adverse inference instruction is DENIED as moot.

---

[1] The Court has not considered Plaintiffs' additional "declaration" (Dkt. 197) filed on April 11, 2024, which functions as an unauthorized surreply. The local rules of this District only allow for a motion, a response brief from the party opposing the motion, and a reply brief from the moving

1

2

## II.    BACKGROUND

**A.    Underlying Conflict between Plaintiffs and the Pierce County Prosecuting Attorney's Office**

Plaintiffs—Retired Sergeant Chris Adamson, Deputy Jason Bray, Officer Lucas Cole, Sergeant Shaun Darby, Lieutenant Cynthia Fajardo, Deputy James Maas, Retired Detective Darrin Rayner, Retired Detective Elizabeth Reigle, and Detective Ryan Olivarez—were employees of the Pierce County Sheriff's Department (PCSD) Special Investigations Unit (SIU) in early 2020. Dkt. 185 at 1. The SIU was tasked with investigating narcotics trafficking and enforcing anti-vice laws in Pierce County. Dkt. 1-2 at 6–10. Defendant Paul Pastor was Sheriff and Defendant Brent Bomkamp was Undersheriff. Dkt. 132-6 at 3.

Plaintiffs allege that beginning in 2018, tensions arose between the Pierce County Prosecuting Attorney's Office (PCPAO) and SIU over practices related to confidential informant disclosures. Dkt. 185 at 9. In July 2019, the Washington state legislature enacted a law defining "confidential informant," Dkt. 1-2 at 100; *see* Dkt. 186 at 54–56 (discussing the definition of confidential informant under RCW 10.56.040(5)), and the PCPAO adopted a policy conforming with that law, Dkt. 1-2 at 107; *see* Dkt. 185 at 9. That policy was the source of further tension. Plaintiffs allege they found the policy confusing and needed clarification. *See* Dkt. 185 at 10. They wrote a letter to Pastor raising concerns about releasing confidential informants' identifying information. Dkt. 132-1 at 13. Defendants, however, contend that SIU members were engaging in problematic practices and not following PCPOA's protocols. *See* Dkt. 131 at 3–4.

---

party. *See* Local Civil Rule 7(b). Parties wishing to file additional briefing must obtain leave from the Court to do so.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 3

1    PCPOA prosecutors told Pastor they were having difficulty working with Plaintiff Darby

2  in particular. Dkt. 132-1 at 11. This information prompted Pastor to have Darby's supervisor,

3  Plaintiff Fajardo, speak with the PCPOA. *Id.* After meeting with the prosecutors, Fajardo spoke

4  with Darby about his conduct. *Id.* But two significant incidents took place after this conversation.

5    First, in January 2020, Prosecuting Attorney Fred Wist declined to file charges against

6  Andrew Lee Wales, a suspect in a narcotics case. *See* Dkt. 137-1 at 4. Wist explained in a written

7  No Charges Filed (NCF) determination that Darby's warrant to search Wales's apartment

8  contained a description of the entrance that was inconsistent with the actual entrance. *Id.* Wist

9  noted numerous shortcomings of a second warrant as well, including an inaccurate description of

10  the entrance, inconsistencies with facts in the first warrant, and procedural deficiencies. He

11  asserted that "PCPAO is not willing to place this issue before the State appellate courts or

12  Washington State Supreme Court." *Id.* With respect to the entry of Wales's apartment, Wist

13  stated that the SWAT team refused to enter the apartment because there was no warrant

14  authorizing entry through the corresponding door. *Id.* at 5. Darby nonetheless entered and

15  searched the residence himself. *Id.* Wist concluded that "Darby's entry into and the ultimate

16  search of the residence with the French doors is not supported by the facts or the law." *Id.*

17    Second, in February 2020, a suspect orally agreed to serve as a confidential informant

18  during an interrogation by Darby. The confidential informant provided information that brought

19  about the arrest of his supplier, Coronel Benitez. Dkt. 135-1 at 2. Although SIU referred the

20  confidential informant and Benitez for prosecution, PCPAO declined to pursue the cases. *Id.*

21  Former Chief Criminal Deputy Prosecutor for Pierce County James Schacht documented the

22  reasons for declining to prosecute in a memorandum. *Id.* With respect to the confidential

23  informant's case, he identified constitutional and statutory-based problems, including failure to

24  provide the informant his constitutional rights in writing in his native language; sparse

documentation of the *Miranda* waiver; deficits in Darby's documentation of his contact with the informant; and the oral nature and lack of a documented confidential informant agreement in violation of RCW 10.56.010 and related protocols. *Id.* at 11.

As to Benitez's case, Schacht asserted that "the entirety of [the informant's] participation is absent from the search warrant affidavit," even though the "entire investigation of Mr. Coronel Benitez was based on information from an incentivized informant." *Id.* at 12. Schacht contended that the warrant could be held void and evidence obtained through the warrant suppressed. *Id.* at 11–13. He also stated that the SIU wrote and filed false reports to mitigate the risk of cartel violence against the confidential informant and his family. *Id.* at 14. Schacht argued this constituted outrageous conduct for which a court could dismiss the case. *Id.*

**B.    Former Sheriff Pastor shuts down the Special Investigation Unit and reassigns Plaintiffs.**

Pastor testified in his deposition that after hearing of these incidents, he was "beginning to say, 'Hey, there may be a pattern here. There's a concern here. I need to have that looked into. Are they going their own way? And if they're going their own way, that bodes problems; so let's get it looked into." Dkt. 132-1 at 12.

On March 20, 2020, Pastor emailed the elected Pierce County Prosecuting Attorney, Mary Robnett. Dkt. 132-2. He expressed his concern regarding SIU members' improper procedural conduct and possible criminal conduct in their use of informants and told Robnett his staff was reviewing materials Fajardo provided "regarding the conduct of cases, service of search warrants and use of informants." *Id.* at 2. He stated, "it has become clear to all of us that something is wrong that goes way beyond professional disagreements or personality conflicts and the something that is wrong is on PCSD's plate . . . . We cannot bend rules or violate laws and do our jobs properly." *Id.* He explained that PCSD would not implement an outside

investigation yet, but that the department would take this step "[i]f and whenever necessary." *Id.*

at 3. He assured Robnett that he could not put the prosecutors in "a position [of] proceeding with

cases if it can be found that pursuit of those cases involved either procedural or legal violations

on our part." *Id.* He further noted that he was "ready and willing to shut down the SIU function

to" "get to the bottom of this and then step on any wrong-doing." *Id.* He said SIU members may

be engaged in "'noble cause' corruption" but he did not yet have "concerns regarding personal-

benefit corruption." *Id.*

In early April 2020, Pastor hired the Kitsap County Sheriff's Office (KCSO) to conduct

an Internal Affairs investigation of possible PCSD policy violations. Dkt 136-1 at 2. Specifically,

Pastor requested that KCSO investigate (1) a search warrant served on February 7, 2020 leading

to the arrest of a confidential informant and false reports; (2) a March 8, 2020 incident related to

the use of a confidential informant and the arrest of Benitez, and (3) a false report created on

March 17, 2020 related to the February 7, 2020 arrest and search warrant. *Id.* That investigation

culminated in a report published on September 1, 2020. Dkt. 136 at 2; *see* Dkt. 136-1.

On April 22, 2020, while the investigation was ongoing, Pastor announced that he was

shutting down the SIU and that SIU officers would be "temporarily assigned to work in other

areas" of PCSD.[2] Dkt. 132-3 at 2; *see also* Dkt. 133-2 at 2. He explained that the shutdown was

to allow for review of "practices within [SIU] in an effort to see that proper procedures are being

followed in every case." Dkt. 132-3 at 2. He explained further that:

> The Department was alerted by a number of Sheriff's Deputies and Deputy
> Prosecutors raising questions about procedures and practices. Outside agencies
> were consulted on these matters and it was determined that there were no criminal
> violations. With the assistance of an outside law enforcement agency we are now
> conducting an administrative review of procedures and practices within the unit.

---

[2] Darby had already been placed on administrative assignment beginning February 24, 2020 for
an unrelated incident that PCSD investigated. Dkt. 136-1 at 2.

*Id.* In a separate email to SIU officers, including each Plaintiff, he explained that "[t]his move is not disciplinary but rather a temporary assignment to ensure the effectiveness of SIU and the investigation the SIU does." Dkt. 133-2 at 2.

In June 2020, PCPAO placed each Plaintiff on its Potential Impeachment Evidence (PIE) list, which tracks "'potential impeachment'[] information about recurring witnesses that may need to be released to defense attorneys, as per the case law." Dkt. 132-8.  In July, PCPAO emailed that list to the News Tribune in response to a reporter's request. Dkt. 132-9 at 2–5. PCPAO later removed Plaintiffs Cole, Maas, and Rayner from the list. *Id.* at 6.

## C.   Pastor and Bomkamp shut down the SIU a second time after Plaintiffs speak to the Tacoma News Tribune.

Pastor restarted SIU on July 13, 2020 and each Plaintiff except Darby and Fajardo returned to the unit. *See* Dkt. 185 at 12; Dkt. 170 at 73; Dkt. 171 at 8. But on July 15, the News Tribune published an article about the investigation entitled "'Failure to follow protocol': Sheriff's drug unit investigated for alleged false reports." Dkt. 186 at 158. The article quoted a statement released to the paper on behalf of Plaintiffs through their attorney. *See id.* at 158–159. It quoted Plaintiffs as saying:

- "The Prosecutor's Office has permanently damaged our reputation because being on the PIE list typically means we have been found untruthful. But here we have been labeled dishonest without any findings of dishonesty," *id.* at 159;

- "This label directly impairs our value as state witnesses, or as consultants in other cases. Now anytime anyone hears one of our names there is a question mark about our integrity," *id.*;

- Plaintiff Fajardo's placement on the impeachment list "has been used politically" due to the Sheriff's election, *id.* at 161;

- Because of personnel changes made by Prosecutor Robnett after her election, the SIU deputies were no longer working with the deputy prosecutors who understood how they operate, *id.* at 162;

- "Without that standing working relationship, the communication broke down and compromised trust between the departments," *id.*;

- "The SIU team members attribute the prosecutor office's actions to a clash over their respective duties as it pertains to undercover operations that involve confidential informants and other clandestine operations. Prosecutors have a duty to disclose confidential informant information and that duty directly conflicts with SIU investigators' duties to maintain informant confidences to develop leads and disrupt drug trafficking in Pierce County," *id.*;

- Placing Plaintiffs on the impeachment list "has put the community at risk and has permanently compromised the professional reputations of ten law enforcement deputies who have committed their lives to making Pierce County a safer place to live," *id.* at 164–65;

- The letters notifying Plaintiffs of their placement on the list "makes it appear that we are all corrupt or that we have done something horribly wrong to be on the list," *id.* at 165.

Later that day, Robnett emailed Bomkamp, informing him that her office was no longer willing to work with SIU members who were on the potential impeachment list. Dkt. 133-1 at 2–4. She wrote:

The arguments put forth by some current and former SIU members, as shown in this morning's News Tribune article, attempt to minimize and distract from the actual legal issues that led to those deputies being placed on the Potential Impeachment (PI) list. While we were aware that this article was coming, seeing today the actual words and arguments used by these deputies through their attorney makes clear that my office must decline working with SIU personnel who are on our PI list for the time being.

The issues that led to these deputies' inclusion on the PI list (which are still under investigation) include:

1. A failure (and perhaps a refusal) to follow our confidential informant protocol (which, to be clear, is being followed by every other police agency in the county);

2. An improper stop and detention of one or more suspects, and an improper application for a search warrant, to conceal the fact that information from a confidential informant was the real reason for the stop and search; and

3. Accounts of a concerted effort to create fictitious police reports by members of the unit.

In contrast with those very serious legal issues, the arguments apparently put forth by the 10 deputies to the News Tribune attempt to minimize the situation, as if it is merely a local government interdepartmental dispute:

1. **That personnel changes meant that "communication broke down and compromised trust between the departments."** Communication has not

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 8

broken down between departments. It was the Sheriff himself who informed me that SIU had not been following the protocol. Communication has apparently broken down between my office and some SIU personnel . . . I agree that trust between our departments has been compromised. Mr. Wist was acting in good faith when he met with the new unit yesterday, but many of the people he was meeting with had apparently already hired Attorney Joan Mell and contacted the newspaper to place blame and criticize my office, including Mr. Wist.

2. **That there is an inherent "clash" between prosecutors' duty to disclose information to the defense about confidential informants and "SIU investigators' duties to maintain informant confidences . . ."** Police and prosecutors alike must follow the law, and one purpose of the confidential informant protocol is for everyone to know and understand what the law requires. The protocol is also in place to ensure investigations, including searches, are done lawfully and yield admissible evidence. If the protocol is not followed and the evidence collected cannot be used at trial, of what use is SIU's efforts?

3. **That charges were dismissed against a suspect because my Chief Criminal Deputy gave that suspect immunity after misinterpreting "quips" made by SIU members.** This is simply untrue. Charges had to be dropped in that case because it appears SIU members made an improper stop and an improper search warrant application, for the purpose of shielding a confidential informant in contravention of state law.

I am troubled by the way the arguments by these 10 personnel seem crafted to minimize and distract from the actual issues that are under investigation. Further, Attorney Joan Mell contacted my civil division this morning making various allegations against deputy prosecutors and insinuating we may incur liability for our actions.

My office is not interested in engaging in a media battle with your SIU personnel. Nor are we willing to negotiate with the attorney who purports to represent 10 of your personnel regarding our PI obligations.

Additionally, today I was made aware of an email sent to the SIU by Det. Elizabeth Riegle that disputes something Fred Wist said during their meeting. She says that she did not want to confront Fred during the meeting. I will not require Fred Wist or any of our employees to try to engage in frank and open discussion with SIU personnel only to be discredited behind their backs by email and media stories . . . .

*Id.*

Bomkamp testified in his deposition that, at Pastor's direction, he addressed Robnett's email by "sending an email . . . advising that the members of SIU would be reassigned" once

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 9

again. Dkt. 186 at 32. He testified that he shut down SIU a second time after receiving Robnett's email because "the prosecutor's office was not willing to work with [a] number of people in the special investigations unit. And a determination was made that until we could work with them effectively, it was not worth the risk to our personnel to be investigating crime that we couldn't effectively prosecute." Dkt. 186 at 33. "The goal was to have actionable cases that would result in actionable prosecution." *Id.* He testified that Robnett "gave us this email and said that she was unwilling to work with our personnel. And that was the basis of the decision." *Id.* When asked whether he determined that the prosecutor's office would not work with the SIU because Plaintiffs spoke to the News Tribune, he responded, "I don't know that it was because they spoke to the media. But it was the reasons outlined in Mary Robnett's letter." *Id.* at 34. He elaborated that "[h]er conclusion was what's listed in 1, 2, and 3[], contrasting with what was provided in the letter form to" the newspaper. *Id.* He also asserted that "I didn't punish them. We reassigned them to other positions within the department." *Id.*

D.     **Plaintiff Fajardo's Campaign for Sheriff**

An election for Pierce County Sheriff was scheduled for November 2020, and the filing deadline was May 15, 2020. Pastor decided not to run for reelection. Fajardo declared her candidacy in May 2020 by the filing deadline. *See* Dkt. 132-1 at 12. She testified in her declaration that "[m]any of [her] co-workers were aware of her intent to run for Sheriff." Dkt. 174 at 6. Former PCSD Lieutenant Peter Cropp and Plaintiff Ryan Olivarez each testified that "it was common knowledge" that Fajardo would run before her formal announcement. Dkt. 169 ¶ 1.28; 180 ¶ 1.9. According to Olivarez:

> Beginning in 2019, it was common knowledge that Lt. Fajardo was going to be running for Sheriff. In our unit we would say things like Fajardo for Sheriff, and she would smile. I was supportive of her, put out yard signs and stood outside on the street at intersections. I was vocal throughout the department who I was voting

1
2

for and knew she would be changing the status quo meaning bringing in new leadership.

Dkt. 169 ¶ 1.28.

3
4
5
6
7
8
9
10
11

Bomkamp testified in his deposition that he preferred another candidate, Edward Troyer, but that he did not endorse, campaign for, or donate to Troyer or any other candidate. Dkt. 132-6 at 4. Bomkamp said he supported Troyer mostly because he "believed he would win." *Id.* He testified that he told Troyer before he announced his candidacy that if Troyer won, Bomkamp would possibly remain in his role as undersheriff, "but there were no promises made." *Id.* Bomkamp said he did not know that he would *not* remain as undersheriff if Fajardo won as he "had not had any discussions with Lieutenant Fajardo. I didn't know she was running for sheriff. I never had any discussions with her about it." *Id.* Bomkamp said he learned Fajardo was running the day of the filing deadline, May 15, 2020. *Id.*

12
13
14
15
16
17
18

Pastor testified in his deposition that he "approached a number of people, and[] encouraged them to run for sheriff. Because I had issues or concerns with everybody who in May came forward and signed up." Dkt. 132-1 at 12. Two weeks before the election, he posted on social media in support of Troyer's candidacy: "Ed Troyer has my vote and support. Why? Because I value the Department and its people and because I believe Ed Troyer is the best candidate. He will carry the Department forward in the right direction. I support Ed Troyer for Sheriff of Pierce County." Dkt. 185 at 20; *see also* Dkt. 132-1 at 12–13.

19
20
21

**E.    Motion to Dismiss Order**

On May 25, 2022, before this case was transferred to the undersigned judge, the Court issued an "Order Granting in Part and Denying in Part Defendants' Motion to Dismiss" ("Motion to Dismiss Order"). Dkt. 24. The Court dismissed the following claims: (1) Plaintiffs' 42 U.S.C.

22
23
24

§ 1983 claims against Schacht and Wist in their individual and official capacity; (2) Plaintiffs'

conspiracy claim; (3) Plaintiffs' 42 U.S.C. § 1983 claim against Pierce County; (4) Plaintiffs' claim for declaratory relief under Washington's Declaratory Judgment Act (UDJA); and (5) Plaintiffs blacklisting claim under state law. *Id.* at 25–26. The Court denied the motion to dismiss as to (1) Plaintiffs' 42 U.S.C. § 1983 claims against Pastor and Bomkamp in their individual and official capacities; and (2) Plaintiffs' state law claims against Pierce County for defamation, false light, outrage, negligent infliction of emotional distress, and breach of contract. *Id.* at 26. Defendants move for summary judgment on these remaining claims. Dkt. 131. Because the previous order on the motion to dismiss has already addressed the legal standards for the remaining claims, the Court will refer back to that ruling where helpful for judicial economy.

### III.   DISCUSSION

**A.   Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The evidence relied upon by the nonmoving party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Ev. 602 ("A witness may testify to

a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."). "'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). But conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Id.* at 888 (internal quotations omitted).

## B.     The Court's Role on Summary Judgment

As a preliminary matter, the Court notes it declines to search the record or piece a case together on Plaintiffs' behalf where they have not cited evidence in support of their arguments. It is the nonmoving party's job "to identify with reasonable particularity the evidence that precludes summary judgment," and if it elects not to do so, the Court need not "scour the record in search of a genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted); *see also Ayers v. Richards*, No. C08-5390 BHS/KLS, 2010 WL 4366069, at *2 (W.D. Wash. Aug. 3, 2010), *report and recommendation adopted*, No. C08-5390-BHS, 2010 WL 4365555 (W.D. Wash. Oct. 28, 2010) ("[T]he court need not search for evidence or manufacture arguments for a plaintiff."); *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("[J]udges are not like pigs, hunting for truffles buried in briefs." (citation omitted)). In fact, the Court *cannot* do so: under the "principle of party presentation," courts must presume that "parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Coal. on Homelessness v. City &*

*County of San Francisco*, 90 F.4th 975, 979 (9th Cir. 2024) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 376–77 (2020)).

Plaintiffs' counsel sought and received a one-day extension of the deadline for their response. Dkt. 173, 175. They could have asked for a longer extension but did not. The Court presumes Plaintiffs had sufficient time to adequately cite the record in support of their factual assertions.

**C.    Federal Claims and Qualified Immunity**

*1.    Qualified Immunity Legal Standard*

In the Motion to Dismiss Order, Chief Judge Estudillo set out the following legal standard as to qualified immunity:

> Government officials are entitled to qualified immunity from damages for civil liability in 42 U.S.C. § 1983 actions if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Harlow*, 457 U.S. at 815. The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *Id.* at 819. Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872–73 (9th Cir. 1993).
>
> In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* The two steps need not be analyzed sequentially. *Pearson*, 555 U.S. at 234. Instead, judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 14

Dkt. 24 at 12–13. At the motion to dismiss stage, the Court held that, taking the allegations in Plaintiffs' complaint as true, they had alleged a violation of clearly established First Amendment rights. Dkt. 24 at 16–17. The Court clarified, however, that "Defendants may still move for summary judgment on the basis of qualified immunity." *See O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016).

Courts engage in the same "two-pronged inquiry" when "resolving questions of qualified immunity at summary judgment," with the standard of Rule 56 substituted for Rule 12. *See Tolan*, 572 U.S. at 655–56. The first prong asks "whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Id.* at 656 (cleaned up). The second prong asks "whether the right in question was clearly established at the time of the violation." *Id.* "Courts have discretion to decide the order in which to engage these two prongs." *Id.* In this case, the Court exercises its discretion to first consider whether Defendants' conduct violated Plaintiffs' constitutional rights.

> 2.  *Plaintiffs have not shown Defendants' conduct violated their First Amendment rights.*

Plaintiffs' federal claims are all based on a theory of First Amendment retaliation. "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v Ceballos*, 547 U.S. 410, 417 (2006). For this reason, "the state may not abuse its position as employer to stifle the First Amendment rights its employees would otherwise enjoy as citizens to comment on matters of public interest." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (cleaned up).

The Ninth Circuit has instructed district courts to engage in "five sequential steps to analyze First Amendment retaliation claims brought by government employees." *Hernandez v. City of Phoenix*, 43 F.4th 966, 976 (9th Cir. 2022). Courts must analyze:

(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id.* (quoting *Eng*, 552 F.3d at 1070). These steps are drawn from the tests established in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), and *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977). Plaintiffs bear the burden of proof on steps one through three, which make up "a prima facie First Amendment retaliation claim." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022). Defendants bear the burden of proof on steps four and five. *Id.* at 776–77, 777 n.2.

Plaintiffs allege they were retaliated against for engaging in four activities: (1) writing a letter to Pastor "to correct compromise of their confidential informant identities," (2) seeking "Guild representation to advocate for their interests," (3) engaging in political activism to support Plaintiff Fajardo's campaign for Sheriff, and (4) communicating with the media. Dkt. 185 at 14–16. The Court analyzes each activity under the five-step analysis set forth in *Hernandez*.

### a)   *Letter to Pastor and seeking Guild representation*

Plaintiffs assert that they engaged in the protected activities of writing Pastor a letter and seeking Guild representation to advocate for their interests. Dkt. 185 at 14–15. But even if this could be considered private speech on a matter of public concern, they cite no evidence to show that these activities were a substantial or motivating factor in Defendants' decisions to shut down the SIU. *See id.* at 14–15, 17–22; *Keenan*, 91 F.3d at 1279. These claims fail step three of the *Hernandez* analysis, and no reasonable jury could find for Plaintiffs on their First Amendment retaliation claims with respect to the letter to Pastor and pursuit of Guild representation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### b)     *Political activism for Fajardo*

Plaintiffs argue that with the first shutdown, Defendants violated their First Amendment rights by retaliating against them in response to their support for Fajardo's campaign for Pierce County Sheriff. Dkt. 185 at 15–16. They contend Defendants knew Fajardo planned to run for sheriff and that her co-plaintiffs supported her candidacy. *Id.* at 16. Plaintiffs argue that Pastor supported Fajardo's opponent, Troyer, on social media, and Troyer promised Bomkamp the undersheriff role. Dkt. 185 at 19–20. Further, they point out that the first shutdown occurred in April, just one month before the May 15, 2020 campaign filing deadline and at a busy phase of the campaign. *Id.* at 19. Defendants argue that Plaintiffs' political activism claim should not survive summary judgment because they shut down the SIU based on legitimate concerns about problems in the unit, not Plaintiffs' political activities. Dkt. 131 at 14, 16. They do not dispute that political speech is a constitutionally protected activity (i.e., a matter of public concern on which Plaintiffs spoke as private citizens). *Id.*

This claim also fails at step three of the *Hernandez* analysis: Plaintiffs have not shown evidence from which a jury could conclude their political activism was a substantial or motivating factor in the first SIU shutdown.

First, Plaintiffs have not shown a genuine factual dispute as to whether Pastor and Bomkamp knew Fajardo was going to run for Sheriff when they first shut down the SIU.[3] The

---

[3] Plaintiffs have not cited evidence that Bomkamp participated in the first shutdown decision. Section 1983 claims must be based on personal participation in the alleged violation. *Hines v. Youseff*, 914 F.3d 1218, 1228 (9th Cir. 2019) ("[Plaintiffs] must show that each defendant personally played a role in violating the Constitution. An official is liable under § 1983 only if 'culpable action, or inaction, is directly attributed to them.'" (internal citations omitted)); *see also Trusov v. Oregon Health & Sci. Univ.*, No. 3:23-CV-77-SI, 2023 WL 6147251, at 2* (D. Or. Sept. 20, 2023) ("[I]n a case alleging the same claim against multiple defendants, there must be specific allegations explaining what each defendant allegedly did wrong, rather than general allegations asserted against them as a group.").

shutdown happened *before* she announced her campaign, and evidence of Bomkamp and Pastor's support for her opponent comes from months *after* the shutdowns occurred. *See supra* Section II.D. Bomkamp testified that he did not know Fajardo was running for sheriff until after the first shutdown. Dkt. 132-6 at 4. Pastor testified that he "knew as of — as of May, when everybody registered." Dkt. 132-1 at 12. General declarations by former SIU members that Fajardo's political ambitions were "common knowledge," Dkt. 169 ¶ 1.28; Dkt. 180 ¶ 1.9, are too conclusory to establish a dispute of material fact that this common knowledge extended outside of the SIU or that Pastor and Bomkamp specifically had this knowledge. *Gillette v. Delmore*, 886 F.2d 1194, 1198–99 (9th Cir. 1989) (plaintiff's allegation that "most of the fire department knew of his activities" was not sufficient on summary judgment to show "evidence that any of his political activities or views caused, or were a substantial factor in, his termination"); *see F.T.C. v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Similarly, that Fajardo mentioned her intent to run for Sheriff in a deposition she gave in a matter involving Pastor in 2007 does not establish that he knew she intended to run in the 2020 election, over a decade later.

Second, even if Plaintiffs had shown that Defendants knew Fajardo was going to run, and that the other Plaintiffs supported her, Ninth Circuit precedent makes clear that is not enough to draw an inference that the SIU shutdown was because of her candidacy. Plaintiffs must come forward with some other evidence that connects the knowledge of their political activity to the alleged adverse action. *See, e.g.*, *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751 (9th Cir. 2001) ("By producing the mere evidence that Sweeney knew of their charges, however, Keyser and Robledo do not create a genuine issue of material fact on the question of whether Sweeney's decision to recommend their reassignment was motivated by their charges.");

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 18

*Erickson v. Pierce County*, 960 F.2d 801, 805 (9th Cir. 1992) (judgment for employer notwithstanding the verdict was appropriate because evidence of knowledge of employee's political activity was not enough to support claim that political activity was a substantial or motivating factor in terminating her); *Gillette*, 886 F.2d at 1198–99. There is simply no evidence in the record that connects Pastor's decision to shut down the SIU in April 2020 to Fajardo's plans to announce her candidacy a month later, or to the other Plaintiffs' support of her. Like the plaintiff in *Erickson*, the evidence submitted by Plaintiffs here "merely suggests that [Plaintiffs] were [Fajardo] supporters" who were reassigned, not that they were reassigned because they were "[Fajardo] supporters." *Erickson*, 960 F.2d at 805. Plaintiffs have not offered direct or circumstantial evidence sufficient to present a triable First Amendment retaliation claim with respect to Plaintiffs' political support for Fajardo.

### c)      *Media communications*

Finally, Plaintiffs argue that Pastor and Bomkamp shut down the SIU the second time in retaliation for Plaintiffs' statements to the News Tribune. Dkt. 185 at 16.[4] Plaintiffs have shown that they engaged in the constitutionally protected activity of speaking to the press by citing their responses to the News Tribune's questions about the PCSD's investigation, Dkt. 49-1 at 9–11, and the News Tribune's July 15, 2020 article entitled "'Failure to follow protocol': Sheriff's drug unit investigated for alleged false reports." Dkt. 186 at 158–65. Defendants do not contend that Plaintiffs spoke in their official capacity (step two under *Hernandez*). But Defendants do argue that Plaintiffs' speech is unprotected because it addressed complaints over internal office affairs, not matters of public concern (step one) and because the interests of the Sheriff's

---

[4] This claim would not apply to Plaintiffs Darby and Fajardo, as they did not return to the SIU before the second shutdown. *See* Dkt. 185 at 12; Dkt. 170 at 73; Dkt. 171 at 8.

Department and the Prosecutor's office in maintaining their working relationships and

investigation procedures outweighs Plaintiffs' interest in speaking (step four). Dkt. 131 at 19–20.

Although Plaintiffs' statements to the News Tribune included complaints about internal

affairs, read as a whole, the speech in question addresses a matter of public concern. The Motion

to Dismiss Order set out the standard for when speech addresses a matter of public concern:

> "To address a matter of public concern, the content of the [officer's] speech must
> involve 'issues about which information is needed or appropriate to enable the
> members of society to make informed decisions about the operation of their
> government.'" *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (2009)
> (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)). *See, e.g.,*
> *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009) (reporting on instances of
> possible corruption is a matter of public concern); *McKinley*, 705 F.2d at 1114
> (speech dealing "with the rate of compensation for members of the city's police
> force and, more generally, with the working relationship between the police union
> and elected city officials" involved matters of public concern). Speech limited to
> "an employee grievance concerning internal office policy" is unprotected. *Connick
> v. Meyers*, 461 U.S. 138, 154 (1983).

Dkt. 24 at 14. Further, "[s]peech involves a matter of public concern when it can fairly be

considered to relate to any matter of political, social, or other concern to the community." *Eng*,

552 F.3d at 1070. Communications regarding the functioning of government generally qualify as

speech relating to a matter of public concern. *Id.* at 1072. "Whether an employee's speech

addresses a matter of public concern is a pure question of law that must be determined 'by the

content, form, and context of a given statement, as revealed by the whole record.'" Dkt. 24 at 15

(citing *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1069 (9th Cir. 2012)).

Plaintiffs' statements to the News Tribune discussed the shutdown of the PCSD narcotics

trafficking investigation unit and PCSD's policies and practices concerning confidential

informants. Dkt. 186 at 158–65. Their speech concerns the extent to which the SIU was

operating, producing prosecutable cases, and protecting confidential informants' identities. The

public needs information about these issues "to make informed decisions about the operation of

their government." *Desrochers*, 572 F.3d at 710. These issues concern the efficacy of Pierce County's efforts to enforce narcotics trafficking laws and thus go beyond "an employee grievance concerning internal office policy." *Connick*, 461 U.S. at 154.

Although Defendants do not seriously argue this point, Plaintiffs have also established at least a dispute of material fact that "the protected activity was a substantial or motivating factor in the defendant's conduct." *Capp*, 940 F.3d at 1053. Plaintiffs argue Robnett's July 15, 2020 email to Bomkamp and Bomkamp's deposition testimony are "direct evidence that the July shut down related to plaintiffs' speech." Dkt. 185 at 18. They also note that the second shutdown occurred just three days after restarting the SIU and four hours after the News Tribune published the article. Dkt. 185 at 19.

Robnett sent her email in direct response to the article and said her office refused to work with SIU personnel on the PIE list. *See* Dkt. 133-1. The email focuses both on the substance of Plaintiffs' statements to the News Tribune and the mere fact that Plaintiffs spoke with the media. Robnett wrote, "I will not require . . . any of our employees to try to engage in frank and open discussion with SIU personnel only to be discredited behind their backs by email and media stories" and asserted, "[m]y office is not interested in engaging in a media battle with your SIU personnel." *Id.* at 3–4.

Bomkamp testified in his deposition that he shut down the SIU and reassigned Plaintiffs to other units after receiving Robnett's email because "the prosecutor's office was not willing to work with the number of people in the special investigations unit. And a determination was made that until we could work with them effectively, it was not worth the risk to our personnel to be investigating crime that we couldn't effectively prosecute." Dkt. 186 at 33. He testified that Robnett "gave us this email and said that she was unwilling to work with our personnel. And that was the basis of the decision." *Id.* He explained further that "[t]he decision was made that until

1    we could effectively provide cases to the prosecutor's office for prosecution, that we wouldn't be

2    in the business," and said, "I don't know that it was because they spoke to the media. But it was

3    the reasons outlined in Mary Robnett's email." Dkt. 186 at 34. He said he believed Robnett was

4    upset because her conclusions regarding the legal issues contrasted what Plaintiffs told the

5    newspaper. *Id.* This is sufficient for a jury to conclude that Plaintiffs' speech to the News

6    Tribune was a substantial or motivating factor in Bomkamp and Pastor's decision to shut down

7    the SIU again and reassign the Plaintiffs. And as the Court recognized in the Motion to Dismiss

8    Order, job transfers can constitute adverse employment actions. Dkt. 24 at 16–17 ("A transfer of

9    job duties alone can constitute an adverse employment action as long as it is reasonably likely to

10   deter employees from engaging in protected activity." (quoting *Quantz v. Edwards*, 264 F. App'x

11   625, 628 (9th Cir. 2008))). Here, the transfer of SIU Plaintiffs was reasonably likely to deter

12   them from speaking with the press.

13           That leads to step four of the *Hernandez* analysis—the *Pickering* balancing test. To

14   sustain its burden under *Pickering*, "the employer must show that 'its own legitimate interests in

15   performing its mission' outweigh the employee's right to speak freely." *Hernandez*, 43 F.4th at

16   976 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam)). This framework

17   seeks to "strike 'a balance between the interests of the [employee], as a citizen, in commenting

18   upon matters of public concern and the interest of the State, as an employer, in promoting the

19   efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering*, 391

20   U.S. at 568). "[T]he *Pickering* balancing inquiry is ultimately a legal question," but "its

21   resolution often entails underlying factual disputes." *Eng*, 552 F.3d at 1071. The *Pickering*

22   balancing test's "qualified restriction of ordinarily protected speech recognizes that '[a]

23   government entity has broader discretion to restrict speech when it acts in its role as employer,

24

but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.'" *Id.* (quoting *Garcetti*, 547 U.S. at 418).

"[G]overnment employers have a strong interest in prohibiting speech by their employees that impairs close working relationships among co-workers, impedes performance of the speaker's job duties, interferes with the effective functioning of the employer's operations, or undermines the employer's mission." *Hernandez*, 43 F.4th at 976 (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *Connick*, 461 U.S. at 151–52; *Pickering*, 391 U.S. at 570, 572–73. "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Pool v. VanRheen*, 297 F.3d 899, 909 (9th Cir. 2002) (quoting *Rankin,* 483 U.S. at 388). A "government employer must have some power to restrain" employees whose speech "detract[s] from the agency's effective operation." *Hernandez*, 43 F.4th at 976 (quoting *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)).

The Ninth Circuit has held that "'[p]romoting workplace efficiency and avoiding workplace disruption' is a valid government interest that can justify speech restrictions." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 781 (9th Cir. 2022) (quoting *Hufford v. McEnaney*, 249 F.3d 1142, 1148 (9th Cir. 2001)). Speech is disruptive "when there is an actual, material and substantial disruption, or there are reasonable predictions of disruption in the workplace." *Id.* at 782 (cleaned up). "Disruption 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Id.* (quoting *Nunez v. Davis*, 169 F.3d 1222, 1228 (9th Cir. 1999)).

The government employer's interest must be weighed against the employee's "interest in speaking out 'to bring to light actual or potential wrongdoing or breach of public trust' within their agencies, since they are often uniquely situated to inform the public about 'government corruption and abuse,'" which has "as much to do with the public's right to hear what an employee has to say about government operations as with the employee's right to speak freely." *Hernandez*, 43 F.4th at 976–77 (first quoting *Connick*, 461 U.S. at 148, then quoting *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066–67 (9th Cir. 2013) (en banc), and then citing *Roe*, 543 U.S. at 82). "The more substantially an employee's speech involves matters of public concern, the weightier the government employer's interests must be in preventing disruption of the workplace or impairment of the employer's mission." *Id.* at 977.

In multiple cases, the Ninth Circuit has held that good working relationships have special importance in police and sheriff's departments because of their quasi-military nature. In *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201 (9th Cir. 2000), the Ninth Circuit held that the *Pickering* balancing test tipped "in favor of the City" because "'a wide degree of deference to the employer's judgment is appropriate' when 'close working relationships are essential to fulfilling public responsibilities,'" and as "a quasi-military organization," "[d]iscipline and esprit de corps are vital to [a police department's] functioning."

In *Pool v. VanRheen*, 297 F.3d 899, 909 (9th Cir. 2002), the Ninth Circuit held that the sheriff's office's interest outweighed the plaintiff's First Amendment rights where the Sheriff demoted the plaintiff after the plaintiff read aloud and published a letter to the editor likening the sheriff's office to a "good ole boy network" and "a septic tank." The panel reasoned that the letter "undermined the sheriff's authority and ability to competently run the Sheriff's Office," "detrimentally affected the functioning of the Sheriff's Office," and led numerous employees to complain to the sheriff about the plaintiff's statements. *Id.* The panel explained that "a wide

degree of deference to the employer's judgment is appropriate when close working relationships are essential to fulfilling public responsibilities, as in a sheriff's office, a quasi-military organization." *Id.* (quoting *Chochran*, 222 F.3d at 1201) (cleaned up). "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Id.* (quoting *Rankin,* 483 U.S. at 388).

The same principles apply here. SIU officers and prosecutors need to be able to work together to prosecute cases. But the prosecutor's office refused to work with Plaintiffs in the SIU. In Robnett's email, she said "seeing today the actual words and arguments used by these deputies through their attorney makes clear that my office must decline working with SIU personnel who are on our PI list for the time being." Dkt. 133-1 at 2. She said her office would not engage in discussions with Plaintiffs or negotiate with their attorney. *Id.* at 3–4. Because the prosecutor's office refused to continue working with Plaintiffs, the PCSD could no longer use Plaintiffs to develop prosecutable cases. Plaintiff's conduct *actually* disrupted the work environment, *see Dodge*, 56 F.4th at 781, and "detrimentally affected the functioning of the Sheriff's Office," *see Pool*, 297 F.3d at 909. In contrast, Plaintiffs' speech, though addressing matters of public concern, was primarily directed at defending their own conduct and expressing their personal disagreement with the prosecutor's policies on confidential informants—not exposing government corruption or abuse. *See Hernandez*, 43 F.4th at 976–77. Under these circumstances, Pastor and Bomkamp's interest in the proper functioning of PCSD and its ability to work with the prosecutor's office outweighs Plaintiffs' First Amendment rights.

   3.   *Plaintiffs have not shown Defendants violated clearly established law.*

Finally, although the Court need not reach the "clearly established" prong of qualified immunity, the Ninth Circuit has also noted that because "the *Pickering* analysis 'requires a fact-

sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will "rarely, if ever, be sufficiently clearly established to preclude qualified immunity."" *Dodge*, 56 F.4th at 784 (quoting *Brewster*, 149 F.3d at 980). Thus, even if Plaintiffs had made out a violation of their First Amendment rights, Bomkamp and Pastor would be entitled to qualified immunity because it was not "patently unreasonable," based on existing Ninth Circuit case law, to believe they could shut down the SIU and reassign Plaintiffs to other units after the prosecutor's office refused to work with them on any cases. *See id.*

**D.    State Law Claims against Pierce County**

*1.    Defamation and False Light Claims*

In the Motion to Dismiss Order the Court set out the following standards for defamation and false light claims:

> "To establish liability for defamation there must be a false and defamatory statement concerning another, an unprivileged communication to a third party, fault amounting at least to negligence on the publisher's part, and either actionability of the statement or special harm caused by the publication." *Eastwood v. Cascade Broad. Co*., 722 P.2d 1295, 1297 (Wash. 1986). Similarly, a false light claim is based upon "someone publiciz[ing] a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed." *Id.* The torts of defamation and false light overlap "when the statement complained of is both false and defamatory," but a "plaintiff need not be defamed to bring a false light action[.]" *Id.* Thus, although distinct, the element of falsity is required for both actions.

Dkt. 24 at 22. Under Washington law, a "defamation claim must be based on a statement that is provably false." *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590, 943 P.2d 350 (Wash. Ct. App. 1997). The plaintiff has the burden of proving falsity. *Id.* at 591.

Plaintiffs argue that the following statements were defamatory: (1) "Our own deputies brought their concerns to our attention because they want to do things right." "We intend to do things according to correct procedures in order to hold offenders accountable and maintain the

public's trust"; (2) "We haven't reached hard conclusions, but we've seen enough to know that [every named plaintiff] should be added on the [PIE] list"; and (3) "This is about SIU's failure to follow protocol." Dkt. 185 at 32. Although Plaintiffs do not cite the source of these statements, they appear to be from the News Tribune article. *See* Dkt. 186 at 158–165.

Defendants' statements that they "inted[ed] to do things according to correct procedures," that Plaintiffs were not "do[ing] things right," that they "should be" on the PIE list, and that "this" is about SIU's failure to adhere to protocol all constitute opinions that are not provably false. *See Schmalenberg*, 87 Wn. App. at 590–91. Even if these statements could be provably false, Plaintiffs have not provided evidence from which a jury could find falsity. To show falsity of the first statement, Plaintiffs simply argue that "Plaintiffs were not doing things wrong" and support this proposition with a citation to "All Decs." Dkt. 185 at 32. That conclusory statement with an overbroad citation does not satisfy Plaintiffs' burden at summary judgment. *See Keenan*, 91 F.3d at 1279. Plaintiffs argue that the second statement was false because the prosecutor's office had taken Cole, Raynor, and Maas off the PIE list, and Bray was on leave. Dkt. 185 at 33. But eventual removal from the list does not prove there was no basis for adding them. Moreover, Plaintiffs cite nothing in the record to establish these facts. *See id.*; *Keenan*, 91 F.3d at 1279. With respect to the third statement, Plaintiffs assert that "[t]here were no policy violations. A plain language reading of the policy clearly shows it." Dkt. 185 at 33. But this assertion is also conclusory and unsupported by citations to the record. *See Keenan*, 91 F.3d at 1279. Plaintiffs have not established disputes of material fact as to their defamation and false light claims.

### 2.    *Negligent Infliction of Emotional Distress*

The Court next considers Plaintiffs' claim for negligent infliction of emotional distress (NIED). As the Court set out in its Motion to Dismiss Order:

1

2

3

4

> To state a claim for negligent infliction of emotional distress under Washington law, a plaintiff must plausibly establish duty, breach, proximate cause, damage, and "objective symptomatology." *Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 205 (Wash. 2014). In other words, a plaintiff must prove emotional distress susceptible to medical diagnosis and proven with medical evidence. *Kloepfel v. Bokor*, 66 P.3d 630, 632 (2003). In an employment context, courts have held "that an employer's conduct was unreasonable when its risk outweighs its utility." *Kumar*, 325 P.3d at 205.

5

Dkt. 24 at 24.

6

7

Plaintiffs have not made a sufficient showing of "objective symptomatology." Although

8

some Plaintiffs testify in their declarations that their mental health has suffered because

9

Defendants disclosed their identities, Plaintiffs fail to cite medical evidence to prove emotional

10

distress susceptible to medical diagnosis or make any other citation to evidence supporting their

NIED argument. *See* Dkt. 185 at 30–31; *Keenan*, 91 F.3d at 1279.

11

    *3.*    *Intentional Infliction of Emotional Distress*

12

The Court next considers Plaintiffs' claim for intentional infliction of emotional distress

13

(IIED). In the Motion to Dismiss Order, the Court listed the elements of an IIED claim as

14

follows:

15

16

17

18

19

> Under Washington law, the elements of the tort of outrage are: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to plaintiff of severe emotional distress. *Kloephel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003). Outrageous conduct does not include "mere insults, indignities, [or] threats." *Id*. at 196. Outrage must stem from behavior that is "'*beyond all possible bounds of decency, . . . atrocious, and utterly intolerable in a civilized community*." *Robel v. Roundup Corp*., 59 P.3d 611, 620 (Wash. 2002) (quoting *Dicomes v. State*, 782 P.2d 612, 630 (Wash. 1989)).

20

Dkt. 24 at 23–24.

21

Plaintiffs argue that "Defendants wrongfully accused [them] of criminal misconduct[,]

22

corruption[,] and serious policy violations," and failed to protect their identities. Dkt. 185 at 31.

23

They argue that the "allegations and disparagements" constitute IIED because they "were

24

particularly loathsome and went beyond insults or personal indignities . . . . Defendants were

motivated by vindictiveness and were malicious." *Id.* This argument is conclusory and lacks factual support or any citation to evidence. *See Keenan*, 91 F.3d at 1279. Plaintiffs have thus failed to make a sufficient showing of their IIED claim.

      4.     *Breach of Contract*

Defendants seek summary judgment on Plaintiffs' breach of contract claim. Dkt. 131 at 26. The Court set out the following elements of a breach of contract claim in the Motion to Dismiss Order:

> The elements of breach of contract are (1) the existence of a contract between the parties, (2) breach of that contract, and (3) harm to the plaintiff. *Univ. of Wash. v. Gov't Employees Ins. Co.*, 404 P.3d 559, 566 (Wash. Ct. App. 2017).

Dkt. 24 at 25.

Plaintiffs argue that Pierce County breached Plaintiffs' statutory rights under RCW 10.93.180 and PCSD's Lexipol Policy 1020. Dkt. 185 at 34–35. Under RCW 10.93.180(1)(a), "[e]ach county prosecutor shall develop and adopt a written protocol addressing potential impeachment disclosures pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and subsequent case law." Plaintiffs argue that "[t]hese statutory rights are at issue here," Dkt. 185 at 35, but it is unclear how this is a contractual term, and even if it is, Plaintiffs do not offer any factual support or citation to evidence supporting their claim. *See Keenan*, 91 F.3d at 1279.

Lexipol Policy 1020 establishes PCSD's procedures for personnel complaints. *See* Dkt. 1-2 at 83. Plaintiffs list the policy's due process requirements, and argue that "Schacht, Pastor, and Bomkamp spearheaded investigations into plaintiffs outside Policy 1020 then publicized and disseminated false allegations of wrongdoing that were never verified and were not credible prior to any investigative findings and when found meritless did nothing to correct the misinformation that they disseminated." Dkt. 35–36. But they offer no citations to the record

in support of their argument. *See id.*; *Keenan*, 91 F.3d at 1279. Plaintiffs have thus failed to make a sufficient showing of their breach of contract claim.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (Dkt. 131); GRANTS Defendants' motion to strike improper surreply (Dkt. 199); STRIKES the declaration filed at Dkt. 197; and DENIES as moot the motion for reconsideration (Dkt. 208). The Clerk is directed to enter judgment in favor of Defendants and close the case.

Dated this 28th day of May, 2024.

Tiffany M. Cartwright
United States District Judge